U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**UNITED STATES DISTRICT COURT**
**for the**
**DISTRICT OF VERMONT**
**CIVIL DIVISION**

2022 JUL 28  PM 1:41

CLERK

BY _____
DEPUTY CLERK

WENDY TOWNER; FRANCISCO AGUILERA;
NICK MACFARLAND; JUSTIN BATES; BRYNN
OTA-MATTHEWS; GABRIELLA GAUS; HARRY
DE LA VEGA; BARBARA V. AGUIRRE; AL-
BERTO ROMERO; BARBARA J. AGUIRRE;
LESLEY SANCHEZ, a minor, by and through her
Guardian ad Litem, Diana Galindo; and LESLIE
ANDRES, a minor, by and through her Guardian ad
Litem, Laura Rodriguez,

        **Plaintiffs,**

v.

CENTURY ARMS, INC., and ROMARM, S.A.,

        **Defendants.**

Civil Action No. 2:22-cv-145

**Jury trial requested**

**COMPLAINT**

**INTRODUCTION**

1.     This case is about the deliberate, unlawful, and irresponsible actions of Defend-ants Century Arms, Inc., and Century Arms, Inc. d/b/a Century Arms (collectively, "Century Arms") and Romarm, S.A., that funneled WASR-10 semi-automatic assault rifles—rifles with uniquely high lethality—to criminals and helped cause the mass shooting at the Gilroy Garlic festival in Gilroy, California on July 28, 2019 (the "Attack").

2.     Plaintiffs—people who were injured or who lost loved ones in this Attack—were directly and foreseeably harmed by Defendants' knowing violation of applicable federal and/or state laws and their failure to exercise reasonable care by implementing appropriate safety measures to prevent the misuse of such firearms in unlawful acts of gun violence.

3.     Defendants knowingly breached the duty to exercise the highest degree of reason-able care in preventing the diversion of firearms to dangerous actors that they had voluntarily assumed when they entered the firearms business.

4.     The laws Defendants knowingly violated, either directly or as accomplices and/or co-conspirators, by channeling WASR-10 firearms to criminals operating inside the United States, include, but are not necessarily limited to: 1) a federal prohibition on the assembly of firearms not suitable for lawful "sporting purposes" and including one or more imported parts (18 U.S.C. § 922(r)); and/or 2) a federal ban on the provision of "machinegun[s]" (as defined in the National Firearms Act (the "NFA," 26 U.S.C. Ch. 53) to the general public (18 U.S.C. § 922(b)(4)) and 3) California's ban on the possession of "assault weapon[s]." Cal. Pen. Code. §§ 30510, 30515, 30605.

5.     One or more of Defendants may also have violated additional laws including, but not limited to, California and Vermont's unfair trade practice laws by engaging in advertising actively encouraging the unlawful or dangerous use of firearms. *E.g.,* 9 V.S.A. § 2453 and Cal. Bus. & Prof. Code. § 17200 et seq.

6.     One or more of Defendants may have also violated additional laws in Vermont, including, but not necessarily limited to, Vermont's prohibition on the manufacture, possession, transfer, offering for sale, receiving, or importing large capacity magazines. 13 V.S.A. § 4021(a).

7.     Defendants' knowing violations of these and/or similar statutes and/or their fail-ure to adopt additional, reasonable safeguards enabled a dangerous individual[1] operating in and around California to acquire a specific WASR-10 firearm (the "Rifle") barred under California law from a Nevada gun dealer on July 9, 2019.

2

8.     As a consequence of Defendants' violations of their duties, the Shooter was also able to illicitly transport the Rifle into California and, ultimately and to use the Rifle to perpetrate the Attack.

9.     Plaintiffs and/or their loved ones were harmed or killed in the Attack.

10.    The Plaintiffs' harms were a direct and foreseeable consequence of Defendants' unlawful and negligent actions.

11.    Had Defendants complied with relevant federal and/or state statutes limiting public access to firearms like the Rifle and/or implemented other reasonable safeguards to prevent the diversion of such especially dangerous firearms to criminals like the Shooter prior to July of 2019, the Shooter would, upon information and belief, not have had access to the Rifle on the day of the Attack.

12.    Additionally, since well before the Attack, Defendants, upon information and belief, had received copious actual and/or constructive notice that their unlawful and reckless practices were channeling firearms – and in particular, WASR-10 firearms like the Rifle –both to the criminal market in general and to the California criminal market specifically (via interstate trafficking).

13.    Defendants also had compelling actual or constructive notice from multiple, well-publicized incidents of gun violence which occurred prior to the Attack that mass shooters disproportionately choose semi-automatic assault rifles like the Rifle to perpetrate crimes like the Attack.

14.    A mass shooting committed by a criminal like the Shooter with a semi-automatic assault rifle like the Rifle illicitly trafficked into California was thus not only a foreseeable but a

---

[1] To not give attention to criminals (*see* https://nonotoriety.com/) this Complaint will avoid refer-

probable consequence of the Defendants continuing to knowingly violate applicable laws and failing to adopt reasonable safeguards to prevent the diversion of firearms to dangerous parties.

15.     Despite these clear warnings, Defendants, rather than reforming their business practices so as to reduce the flow of firearms like the Rifle to criminals likely to misuse them in acts of unlawful violence, chose to place profit over public safety by continuing to unlawfully and recklessly supply the criminal market leading up to July of 2019.

16.     Defendants' breach of their duties thus directly and proximately contributed to the Attack and caused Plaintiffs' harms.

17.     Upon information and belief, Defendants have continued to persist in their negligent and unlawful misconduct following the Attack and, as a result, WASR-10 assault rifles continue to contribute to an ongoing public nuisance of gun violence within California and the United States.

18.     Plaintiffs are entitled to redress against the Defendants for the harms foreseeably flowing from their unlawful and negligent actions.

19.     This suit does not implicate or challenge the right of responsible companies to manufacture market, distribute and/or sell firearms lawfully and responsibly while complying with all relevant laws and reasonable safety standards.

20.     Instead, Plaintiffs seek to hold Defendants accountable for harm resulting directly and foreseeably from their actions in manufacturing, marketing, distributing and/or selling firearms or magazines in an unlawful and irresponsible manner.

---

encing the attacker's name and will, instead, refer to him only as "the Shooter."

**Jurisdiction and Venue**

21.    This Court has subject matter jurisdiction under 28 U.S.C § 1332(a)(3), because this action is between citizens of different states, Defendant Romarm, S.A. is a citizen or subject of a foreign state, and the amount in controversy exceeds $75,000.

22.    This Court has personal jurisdiction over Romarm, S.A., because, upon information and belief, Romarm, S.A., has targeted Vermont specifically by channeling its products through an exclusive distributor located there (Century Arms).

23.    This Court has personal jurisdiction over Century Arms because, upon information and belief, Century Arms is incorporated in this District and/or because the suit arises out of Century Arms' contacts with this District.

24.    Venue is appropriate for this District under 28 U.S.C. § 1391(b)(3), because Century Arms operates a facility in Georgia, Vermont, and Century Arms and Romarm, S.A. are subject to this Court's personal jurisdiction.

**Parties**

25.    Plaintiffs WENDY TOWNER; FRANCISCO AGUILERA; NICK MACFAR-LAND; JUSTIN BATES; BRYNN OTA-MATTHEWS; GABRIELLA GAUS; HARRY DE LA VEGA; BARBARA V. AGUIRRE; ALBERTO ROMERO; BARBARA J. AGUIRRE; LESLEY SANCHEZ, a minor, by and through her Guardian ad Litem, Diana Galindo; and LESLIE ANDRES, a minor, by and through her Guardian ad Litem, Laura Rodriguez,

26.    Upon information and belief, Century Arms is incorporated in Vermont, headquartered in Delray Beach, Florida and serves as the exclusive distributor of Romarm, S.A. firearms throughout the United States.

27.     Upon information and belief, Century Arms maintains a facility for modifying, warehousing and/or shipping imported Romarm, S.A. firearms in Georgia, Vermont.

28.     Upon information and belief, Romarm S.A. is a foreign firearms manufacturer operating out of Romania which manufactured the Rifle and other similar WASR-10 assault rifles with the intent of selling many such rifles throughout United States and, specifically, in California, through one or more intermediaries.

29.     Upon information and belief, Century Arms and Romarm, S.A. coordinate in a scheme involving Century Arms breaking down, modifying, and reassembling WASR-10 assault rifles received from Romarm, S.A. in order to undermine federal firearms law while attempting to maintain a veneer of legitimacy.

30.     Upon information and belief, Century Arms imported, modified, reassembled, and distributed the Rifle in accordance with this scheme and in violation of one or more federal and/or state laws.

### Factual Allegations

I.  All Defendants Voluntarily Assumed a Duty to Exercise the Highest Degree of Reasonable Care -- Including Following All Relevant Federal and/or State Laws – When Manufacturing, Marketing, Distributing and/or Selling Firearms Like the Rifle

31.     All Defendants involved in the chain of distribution of firearms like the Rifle assumed a duty to carefully learn and comply with all relevant federal and/or state firearms laws which are designed to minimize the risk of products like the Rifle falling into the hands of dangerous individuals like the Shooter.

32.     These laws include, but are not limited to,

- a federal prohibition on the assembly of firearms not suitable for lawful "sporting purposes" from imported parts (18 U.S.C. § 922(r));

- a federal ban on the provision of "machinegun[s]" (as defined in the NFA) to the general public (18 U.S.C. § 922(b)(4)) and

- California's ban on the possession of assault weapons Cal. Pen. Code. §§ 30510, 30515, 30605.

- Vermont's prohibition on the manufacture, possession, transfer, offering for sale, receiving, or importing large capacity magazines. 13 V.S.A. § 4021(a).

33.     Defendants knowingly violated these laws.

34.     Independent of any statutorily defined aspects of the relevant standard of care, all Defendants also voluntarily assumed a duty to implement additional, reasonable safeguards in order to minimize the risk that dangerous products like the Rifle would fall into the hands of dangerous individuals like the Shooter.

35.     Defendants violated their standard of care by failing to implement these safeguards.

II.  All Defendants Knowingly Violated One or More Federal or State Laws (Either Directly or as Accessories) and Failed to Implement Reasonable Safeguards In Order to Target and Profit from the Criminal Firearms Market

A.  Century Arms and Romarm, S.A. Knowingly Conspired in a Scheme to Assemble and Sell WASR-10 Rifles Like the Rifle to the Public in Violation of 18 U.S.C. § 922(r)

36.     Federal law generally bars the importation of firearms which are not "suitable for or readily adaptable to sporting purposes" (*see* 18 U.S.C. § 925(d)(3)), with some exceptions that are not relevant to this case.

37.     The ATF "has determined that certain features designed for military application are indicative of non-sporting rifles and shotguns" and has further identified that "[f]eatures which are not recognized as sporting include, but are not limited to, folding or telescoping stocks, pistol grips that protrude conspicuously beneath the action of the weapon, a bayonet or bayonet mount, a flash suppressor or threaded barrel designed to accommodate a flash suppressor, a grenade launcher and night sights." ATF Firearms Guide on *Importation of Firearms & Ammunition,* https://www.atf.gov/firearms/firearms-guides-importation-verification-firearms-ammunition-and-implements-war-import (last reviewed Sep. 22, 2016); *see also* ATF Associate Director (Compliance), *Report and Recommendation on the Importability of Certain Semiautomatic Firearms* at 6 (Jul. 6, 1989), https://www.atf.gov/file/61761/download (identifying the ability to accept detachable, large capacity magazines as another feature associated with military, rather than sporting, applications).

38.     In an effort to prevent firearms importers from circumventing the importation ban, a related provision of the Gun Control Act of 1968 renders it "unlawful for any person to assemble from imported parts any semiautomatic rifle or any shotgun which is . . . not particularly suitable for or readily adapted to sporting purposes" for resale to the general public. *See* 18 U.S.C. § 922(r).

39.     These laws reflect Congress's recognition of the fact that firearms not "suitable for or readily adapted to sporting purposes" pose an unreasonable risk to public safety because

they are disproportionately attractive to and useful to criminal actors like the Shooter who wish to utilize them in incidents like the Attack or other unlawful acts of violence.

40.     Non-sporting features like a "folding or telescoping stock" and/or a "pistol grip[] that protrude[s] conspicuously beneath the action of the weapon" and the ability to accept large capacity, detachable magazines make firearms like the Rifle more effective in military combat or mass shooting scenarios like the Attack while serving no or little benefit to civilian users of such firearms employing them for lawful ends like hunting.

41.     Century Arms and Romarm, S.A. knowingly cooperated to violate 18 U.S.C. § 922(r) either directly (in the case of Century Arms) or as an accomplice and/or co-conspirator (in the case of Romarm, S.A.) by assembling firearms like the Rifle from 1) imported parts with 2) features rendering them not suitable for "sporting purposes."

42.     An accomplice or co-conspirator who indirectly assists in the commission of an offense is as responsible for the ultimate statutory violation as the principal. *See* 18 U.S.C. § 2.

43.     Here, Romarm, S.A. manufactures and exports stripped down versions of WASR-10 assault rifles which lack features that might render them barred under the "sporting purposes" test – such as, for example, a "folding or telescoping stock" and/or a "pistol grip[] that protrude[s] conspicuously beneath the action of the weapon."

44.     Romarm, S.A. then ships such stripped-down rifles to Century Arms with the intention and expectation that Century Arms will disassemble the imported firearms and then reassemble them while 1) introducing a number of non-sporting features with primarily military applications and 2) replacing a number of the foreign-manufactured parts of the firearms with American-made parts.

45.     Upon information and belief, Century Arms then performs the disassembly and reassembly process before distributing WASR-10 rifles, either directly or through intermediary distributors like the Doe Defendants, to retailers throughout the country.

46.     This disassembly and reassembly process seeks to undermine federal firearms importation laws by exploiting an erroneous ATF regulation which suggests that the "sporting purposes" test does not apply as long as the completed firearms have ten or less imported parts. *See* 27 C.F.R. § 478.39(a).

47.     However, under the plain language of § 922(r), it is illegal to assemble any semi-automatic rifle which, like the Rifle, a) incorporates *any* foreign-made parts and b) includes features rendering it not suitable for "sporting purposes."

48.     Thus, the named Defendants knowingly violated § 922(r) either directly or as accessories by supplying WASR-10 rifles like the Rifle to the public after modifying them in accordance with the scheme described above to include both a) one or more imported parts and b) one or more non-sporting features.

49.     Here, the Rifle, as used by the Shooter in the Attack, had, upon information and belief, both a) one or more imported parts and b) one or more non-sporting features including a "folding or telescoping stock," a "pistol grip[] that protrude[s] conspicuously beneath the action of the weapon" and the ability to accept large capacity detachable magazines. *See* photographs below:



The rifle ▇▇▇ used to shoot 21 festival goers



▇▇▇ loaded drum magazine with 75-round capacity          ▇▇▇ taped high-capacity magazines

50.     Upon information and belief, all of the relevant imported parts and non-sporting features were not materially altered by the Shooter or any other party after they left the possession of Century Arms.

B. All Defendants Coordinated to Assist Individuals Like the Shooter in Unlawfully Possessing Assault Weapons Banned Under California Law Within California

51.     California bans the possession of assault weapons (Cal. Pen. Code. § 30605(a)), which are defined to mean 1) a certain type of gun which contains certain features (Cal. Pen. Code. § 30515) and/or 2) be one of a list of enumerated firearms or their analogues.  Cal. Pen. Code. § 30510.

52.     As relevant here, an "assault weapon" under California law includes a semi-automatic, centerfire rifle with a detachable magazine which has one or more disqualifying features including, *inter alia*, "[a] folding or telescoping stock" or "[a] pistol grip that protrudes conspicuously beneath the action of the weapon." Cal. Pen. Code § 30515(a)(1).

53.     An assault weapon also includes "all AK series" weapons regardless of their manufacturer. *See* Cal. Pen Code § 30510(a)(1), (f).

54.     There is great overlap between those features which render a firearm like the Rifle a prohibited assault weapon under Cal. Pen. Code § 30515(a)(1) and those features which ATF has deemed render a gun a "non-sporting" firearm that poses a disproportionate risk to public safety.

55.     Upon information and belief, including the above photographs, the Rifle, as used by the Shooter in the Attack, was a prohibited assault weapon under one or both of §§ 30510(a)(1), 30515(a)(1) because 1) the Rifle was a variant of the AK-47 and 2) was a semi-automatic, centerfire rifle with a detachable magazine which included one or more disqualifying features including a "[a] folding or telescoping stock" and/or "[a] pistol grip that protrudes conspicuously beneath the action of the weapon." *See* photographs supra at ¶ 49.

56.     Like federal law, California law is clear that an accomplice or co-conspirator who indirectly assists in the commission of an offense is as responsible for the ultimate statutory violation as the principal. *See* Cal. Pen. Code §§ 31; 971.

57.     Upon information and belief, all Defendants knowingly coordinated to act as accessories enabling and assisting the unlawful possession of assault weapons by criminals like the Shooter operating within California.

58.    Romarm S.A. and Century Arms intentionally engaged in a distribution scheme which floods states around California – including Nevada -- with weapons constituting assault weapons under California law and provide more weapons to these states than would be consistent with demand by lawful consumers in those states.

59.    These Defendants engaged in these practices with actual or constructive knowledge that firearms – and, in particular, assault weapons barred under California law -- are routinely trafficked to jurisdictions with strong gun violence prevention laws (like California) from states with weaker gun violence prevention laws (like Nevada) and used in crimes in those destinations.

60.    They also engage in this distribution scheme while engaging in marketing and/or pricing strategies that encouraged criminals operating in and around California to acquire weapons like the Rifle which cannot lawfully be possessed within California from these surrounding jurisdictions.

61.    Further, upon information and belief, these Defendants continued to manufacture and distribute firearms like the Rifle while failing to implement reasonable safeguards to prevent the interstate trafficking of firearms like the Rifle within the United States criminal market.

62.    In so doing, they guaranteed that weapons like the Rifle would be transferred into the criminal market and unlawfully possessed and used by parties like the Shooter.

63.    Upon information and the belief, all of Defendants, thus, with either actual or constructive knowledge, aided and abetted and/or conspired with individuals like the Shooter so as to enable their unlawful possession of assault weapons within the United States in order to profit from supplying the U.S. criminal market.

C.  All Defendants Knowingly Coordinated to Violate § 922(b)(4)'s Prohibition on the Sale

    of "Machinegun[s]" to Members of the General Public Either Directly And/or As Ac-

    complices/Co-Conspirators

64.      § 922(b)(4) prohibits the sale of a "machinegun" to any member of the public

who, like the Shooter, has not been specifically authorized by the Attorney General. *Id.*

65.      This provision incorporates the NFA definition of "machinegun" as:

> any weapon which shoots, is designed to shoot, or can be readily re-
> stored to shoot, automatically more than one shot, without manual
> reloading, by a single function of the trigger. The term shall also in-
> clude the frame or receiver of any such weapon, any part designed
> and intended solely and exclusively, or combination of parts de-
> signed and intended, for use in converting a weapon into
> a machinegun, and any combination of parts from which
> a machinegun can be assembled if such parts are in the possession or
> under the control of a person.

> 26  U.S.C. § 5845(b).

66.      ATF has specifically recognized that the "designed to shoot" language in NFA's

definition of "machinegun[s]" includes "includes those weapons which have not previously func-

tioned as machineguns but possess design features which facilitate full automatic fire by a simple

modification or elimination of existing component parts." ATF Rul. 82-8 at 1.

67.      A WASR-10 firearm like the Rifle, constitutes a "machinegun" even if designed

to fire in a semi-automatic fashion, because, as per ATF's guidance, it "possess[es] design fea-

tures which facilitate full automatic fire by a simple modification or elimination of existing com-

ponent parts."

68.      For example, a WASR-10 firearm like the Rifle can be easily modified to accom-

plish this goal by individuals with minimal financial resources and little to no gunsmithing ex-

pertise through methods including but not limited to:

- replacing the manufacturer-installed sear system inside the firearm (which enables semi-automatic fire) with a third-party sear system which enables automatic fire;

- shaving down part of the manufacturer-installed sear system to change the way it functions and

- attaching an external device such as a "bump stock" or trigger crank to the firearm.

69.      Whether or not the Rifle used in the Attack was, in fact, modified to fire in a fully automatic fashion, its ready susceptibility to such modification rendered it a "machinegun" as sold, prohibiting its sale to the general public.

70.      Thus, all Defendants violated § 922(b)(4), either directly or as accomplice and/or co-conspirators, by providing, either directly or through intermediaries, "machinegun[s]" like the Rifle for sale to members of the public not authorized by the Attorney General (like the Shooter).

71.      Upon information and belief, one or more Defendants violated 13 V.S.A. § 4021 by manufacturing, possessing, transferring, offering for sale, purchasing, or receiving or importing into Vermont a large-capacity ammunition feeding device, after October 1, 2018.

72.      Specifically, upon information and belief, Defendants distributed, after October 1, 2018, a large-capacity magazine that was used in the Attack, in violation 13 V.S.A. § 4021.

D.  These Statutory Violations – As Well as Violation of Additional Aspects of the Relevant Standard of Care Not Related to Any Statute – Persuasively Demonstrate Defendants' Negligence

73.      All of the above statutes – as well as other potentially relevant state and/or federal firearms laws– were designed not only to prevent the risk of gun violence generally but also, in particular, mass shootings like the Attack committed with exceptionally dangerous military-style weapons.

74.     All of the above statutes – as well as any similar state and/or federal firearms laws– were designed to protect all members of the public, including these Plaintiffs.

75.     Other potentially relevant statutes, such as those pertaining to wrongful marketing (*e.g.,* Cal. Bus. & Prof. Code. § 17200 *et seq*.; 13 V.S.A. 4022, prohibiting bump-fire stocks) were also designed to protect members of the public like the Plaintiffs from harm including the misuse of dangerous instruments like the Rifle.

76.     Because, as discussed below, Defendants violated one or more of these or similar, relevant statutes in a way which proximately lead to Plaintiffs' harm, a prima facie case of negligence is established. *See, e.g., Marzec-Gerrior v. D.C.P. Industries, Inc.,* 674 A.2d 1248 at 1250, 164 Vt. 569 (Vt. 1995) (Dooley, J., concurring) and Cal. Evid. Code § 669(a).

77.     However, upon information and belief, Defendants were also negligent for failing to follow aspects of the standard of reasonable care independent of any statutory violation by failing to implement any reasonable safeguards so as to prevent diversion of WASR-10 firearms and other guns to the California criminal market.

78.     For example, Romarm S.A. and Century Arms, upon information, failed to implement reasonable supervision procedures over downstream distributor and dealer networks despite strong indications of likely criminal commerce in firearms within these distributor and dealer networks—including, but not limited to, trace data revealing that a disproportionately large number of military-style weapons like the Rifle were being diverted from these networks into the California criminal market.

III. Upon Information and Belief, All of Defendants, Prior to 2019 Received Copious Actual or

     Constructive Notice that Their Violations Were Leading to Their Firearms Being Dispropor-

16

tionately Used in Unlawful Acts Gun Violence – Including in Incidents Within California –
But Callously Persisted in their Unlawful and Negligent Conduct

79.     Upon information and belief, all of Defendants, prior to 2019, received copious
actual or constructive notice from information including, but not limited to, trace requests, that
their negligent and unlawful distribution practices regarding WASR-10 assault rifles and other
firearms were fueling gun violence in California and other jurisdictions with strong gun violence
prevention regimes.

80.     For example, a 2011 report from the Center on Public Integrity described how the
WASR-10 has been the most common gun purchased in the United States to later be connected
to crimes occurring in Mexico.

81.     Mexico, like California, has strong gun violence prevention laws.

82.     Reports from the ATF reveal that in a four-year time frame in the mid-2000s, over
500 WASR-10 rifles initially purchased in the United States were later recovered from Mexican
crime scenes and/or during criminal investigations.

83.     This accounted for over 17% of all such guns recovered during this time frame --
more than any other pistol or rifle during this period.

84.     Many of the WASR-10 rifles recovered during criminal investigations in Mexico
were, like the Rifle, configured to include various non-sporting features with primarily military
applications (such as the ability to accept high-capacity magazines).

85.     Upon information and belief, this is because such non-sporting features render
WASR-10 firearms more effective tools for narcotraffickers who need to prepare for military-
style combat such as firearms battles with Mexican police and security forces.

86.     Upon information and belief, in addition to Defendants having actual or constructive notice of the above report and/or similar media reports, the ATF and/or other law enforcement agencies contacted various Defendants (including Century Arms) as part of its trace requests to track each one of these recovered firearms through the chain of distribution down to the initial seller.

87.     These trace requests constituted specific, frequent and continuous indicators to relevant Defendants that their negligent and unlawful business practices were supplying WASR-10 firearms to the criminal market in general.

88.     The above data also compellingly illustrated the common phenomenon of firearms being illicitly trafficked from jurisdictions with comparatively weaker laws (like various United States jurisdictions) to jurisdictions with comparatively stronger gun violence prevention laws (like California, and Mexico).

89.     Upon information and belief, all of Defendants, prior to 2019, also had specific actual or constructive notice that their negligent and/or unlawful distribution practices were channeling semi-automatic assault rifles like the WASR-10 into California from sources in the surrounding states.

90.     2017 data from the ATF confirmed that Nevada is a major source state for crime guns later recovered in California – linking 1,554 California crime guns to sales in Nevada.

91.     Only Arizona exceeded Nevada as a source of California crime guns in this data.

92.     This flow of firearms from source states like Nevada into jurisdictions like California has devastating consequences.

93.     In 2017, researchers at the University of California at Berkeley found that within 14 days after the start of a Nevada gun show, hospital admissions for gunshot wounds at California hospitals within two hours of the Nevada border jumped by 70%.

94.     Federal court cases prior to 2019 also provided Defendants with actual and/or constructive notice both of the general phenomenon of firearms trafficking from source states like Nevada into California – and one even specifically identified WASR-10 rifles as particularly likely to be transported in such trafficking schemes.

95.     Specifically, in *United States v. Carranza,* 2011 U.S. Dist. LEXIS 100951 (Aug. 5, 2011) *rec'n adpt'd by* 2011 U.S. Dist. LEXIS 101113 (Sept. 7, 2011), a federal court found that ATF had reasonable suspicion sufficient to support the arrest of an individual buying a large quantity of assault rifles – including five Century Arms AK-47 type rifles firearms – from two different Nevada gun stores in a short time period.

96.     The Court emphasized testimony from an ATF agent that such "assault style rifles are in high demand by drug trafficking organizations in Mexico and *also by persons in California where the sale of assault style rifles is prohibited.*"   *Carranza,* 2011 U.S. Dist. LEXIS 100951 at *31-32 (emphasis added).

97.     Similarly, in 2018, at least three Nevada residents were indicted in federal court for a firearms trafficking scheme supplying criminals in and around the Bay Area.

98.     Upon information and belief, in addition to Defendants having actual or constructive notice of the above cases and/or media reports, the ATF and/or other law enforcement agencies contacted various Defendants (including Century Arms) as part of their trace requests to track each one of the firearms recovered during criminal investigations in California through the chain of distribution down to the initial seller.

99.     These contacts from law enforcement, upon information and belief, constituted specific, frequent and continuous indicators to all relevant Defendants that their negligent and unlawful business practices were supplying large quantities of firearms -- including WASR-10 firearms like the Rifle -- to the California criminal market.

100.    All Defendants, upon information and belief, also had actual or constructive knowledge of a well-publicized string of mass shootings that provided, prior to 2019, compelling proof that semi-automatic assault rifles like the Rifle are the preferred firearm of mass shooters because of their ability to inflict so much damage on multiple targets in a short time frame.

101.    These shootings included, but are not limited to, the following incidents:

- In December, 2007 a shooter armed with a WASR-10 semi-automatic assault rifle killed 8 people at a shopping mall in Omaha, Nebraska before taking his own life.

- In July 2012, a shooter armed with a semi-automatic assault rifle and several other guns attacked a movie theater in Aurora Colorado, killing 12 people and injuring 70 others.

- In December 2015 a shooter armed with a semi-automatic assault rifle attacked the Inland Regional Center in San Bernardino, California, killing 14 people and injuring 22 others.   This rifle was modified by the mass shooter to fire automatically and was modified via the "shaving down" method described *supra*.

- In February 2017, a young man armed with a semi-automatic assault rifle attacked Marjory Stoneman Douglas High School in Parkland, Florida, killing 17 people and injuring 17 others.

102.    Although it postdates the Attack, a mass shooter attacked a Walmart in El Paso, Texas using a WASR-10 firearm in August 2019 and killed 22 people while wounding 24 others

in an incident which further underscores the unique susceptibility of firearms like the Rifle to misuse in mass shootings

103.     Defendants did not take any action to reduce the risk of their firearms being misused in a tragedy like the Attack.

104.     If anything, one or more of Defendants may have chosen to exacerbate the risk by recklessly marketing firearms in ways which emphasized their effectiveness in military-style assaults like the Attack.

105.     Taken collectively, all of the information available to the relevant Defendants made it abundantly clear, prior to 2019, that if they continued to violate relevant statutes like those described herein and to failed to institute additional, reasonable safeguards it would be highly likely – if not inevitable -- that a firearm like the Rifle would be illicitly trafficked into a jurisdiction like California and used in an incident like the Attack.

106.     Upon information and belief, Defendants callously persisted in their unlawful and negligent conduct either with actual or constructive knowledge of the likelihood that an incident like the Attack would result.

107.     Specifically, at minimum, Defendants, willfully blinded themselves to relevant red flags (such as those described herein) indicating that firearms – including, in particular, semi-automatic firearms like the Rifle -- were being unlawful diverted to the criminal market and used in crimes.

108.     Upon information and belief, Defendants have continued in the negligent and unlawful practices described herein without any significant change even after the Attack and up until the filing of this Complaint.

IV. Upon Information and Belief, Defendants' Continued Violations of Relevant Statutes and Failure to Implement Additional, Reasonable Safeguards Directly and Foreseeably Led to the Attack

109. Defendants' knowing violations of relevant statutes and/or failure to institute reasonable safeguards directly led to Plaintiffs' harm.

110. For example, in terms of statutory violations:

- upon information and belief, had Romarm S.A and/or Century Arms not knowingly violated 18 U.S.C. § 922(r), either directly or as accessories, by assembling a semi-automatic rifle with non-sporting features and including one or more imported parts, the Rifle would not have been available for sale to the Shooter on July 9, 2019 and could not have been used to harm the Plaintiffs in the Attack;

- upon information and belief, had all Defendants not knowingly violated § 922(b)(4), either directly or as accomplices/co-conspirators, by providing a "machinegun" to the Shooter, the Shooter also would not have been to use the Rifle in the Attack and

- upon information and belief, had Defendants not violated Cal. Pen. Code. § 30605 as co-conspirators and/or accomplices to unlawful users like the Shooter by continuing to supply downstream distributors and/or dealers with firearms like the Rifle while, at minimum, blinding themselves to red flags that these actors assisting in the illegal possession of assault weapons by criminals like the Shooter within California, the Shooter also would not have had access to the Rifle and could not have used it in the Attack.

111. The above listing of statutory violations contributing to the Attack is not intended to be exhaustive; some or all Defendants may also have violated additional statutes in ways

which directly contributed to the Attack – including, for example, Cal. Bus. & Prof. Code. § 17200 et seq. and 13 V.S.A. § 4021(a).

112.    Defendants' failure to implement appropriate, additional safeguards when manufacturing, marketing, distributing, and/or ultimately, selling exceptionally dangerous WASR-10 assault rifles so as to minimize their risk of misuse by individuals like the Shooter in incidents like the Attack also directly contributed to Plaintiffs' harm.

113.    Specifically, upon information and belief, had Defendants instituted appropriate safeguards, including, but not limited to, those outlined above in terms of supervising downstream distributors and retailers of their products and instituting checks against interstate firearms trafficking and acquisition of assault rifles by malicious actors, the Shooter would, upon information and belief, not have been able to arm himself with the Rifle.

114.    For example, upon information and belief, had Century Arms stopped supplying non-California compliant WASR-10 firearms to states surrounding California in light of trace data, media reports and other information illustrating the substantial risk that firearms like the Rifle would be diverted to the California criminal market and used in acts of violence like the Attack, the Shooter could not have acquired the Rifle.

115.    As identified above, trace data, media reports and/or other sources readily available to Defendants prior to 2019 demonstrate a mass shooting incident like the Attack perpetrated with an assault rifle like the Rifle illicitly trafficked into California was an eminently foreseeable consequence of Defendants' choices to break the law and to fail to implement additional, reasonable safeguards.

116.    All of Defendants callously and recklessly persisted in their misconduct leading up to 2019 – and thereby, directly and foreseeably placed the Rifle in the Shooter's hands.

117.    Plaintiffs' are entitled to redress from Defendants to compensate them for the harms which foreseeably resulted from Defendants' unlawful and negligent misconduct.

## FIRST CAUSE OF ACTION
## PRODUCTS LIABILITY
## (AGAINST ALL DEFENDANTS)

118.    Plaintiffs incorporate each allegation set forth in all preceding paragraphs of this Complaint as if set forth in full herein.

119.    Each Defendant owed all members of the public, including Plaintiffs, a duty not to manufacturer, market, distribute and/or sell products which pose an unreasonable risk of danger relative to their benefits.

120.    Here, the Rifle, as designed, was defective in that the risks that it would be misused in an unlawful act of gun violence like the Attack outweighed any conceivable benefits associated with the design.

121.    Indeed, the fact that the risks of the Rifle, as designed, outweighed any conceivable benefit, is precisely why it is a prohibited "non-sporting" firearm under 18 U.S.C. § 922(r), a prohibited "machinegun" under § 922(b)(4) and a prohibited "assault weapon" Cal. Pen. Code. §§ 30510, 30515, 30605.

122.    Upon information and belief, safer alternative designs – such as designs which did not include the ability to accept a large capacity detachable magazine, did not have a conspicuous pistol grip and/or did not have a folding stock – were technologically and economically feasible prior to 2019.

123.    All Defendants violated their duty not to manufacturer, distribute, market, and/or sell defective products by selling unreasonably dangerous and/or illegal WASR-10 weapons like the Rifle to the public.

124.     But for Defendants' violation of this duty, the Shooter would not have had access to the Rifle and could not have used it to harm the plaintiffs.

125.     An individual like the shooter using a firearm like the Rifle in a military-style assault like the Attack was a foreseeable consequence of Defendants' decision to manufacturer, distribute, market, and/or sell defective products with features making them particularly effective tools for such assaults.

126.     As a direct and proximate result of Defendants' misconduct, Plaintiffs have suffered, and continue to suffer, great pain of mind and body, shock, severe and persistent emotional distress, physical manifestations of emotional distress, loss of enjoyment of life, loss of earnings and earning capacity, and incurred substantial expenses for medical psychological treatment, therapy and counseling and other economic and/or noneconomic damages in amounts in excess of the jurisdictional limits of this Court.

127.     Plaintiffs are entitled to relief under a theory of products liability.

## SECOND CAUSE OF ACTION
## NEGLIGENCE
## (AGAINST ALL DEFENDANTS)

128.     Plaintiffs incorporate each allegation set forth in all preceding paragraphs of this Amended Complaint as if set forth in full herein.

129.     Each Defendant owed Plaintiffs—and all members of the public—a duty to abide by the highest standard of reasonable care in providing especially dangerous WASR-10 firearms like the Rifle to the public (either directly or indirectly).

130.     This included not only following federal and/or state laws embodying aspects of this standard of care but also instituting additional, reasonable safeguards unrelated to any statute to prevent the misuse of firearms like the Rifle.

131.    Each Defendant violated this standard of care in one or more ways.

132.    First, each Defendant failed to adhere to the required standard of care by know-ingly violating, either directly or as an accomplice or co-conspirator, one or more federal and/or state firearms laws including, but not limited to, 18 U.S.C. § 922(r), (b)(4); Cal. Pen. Code. § 30605; 13 V.S.A. § 4021.

133.    Each Defendant also failed to implement additional, reasonable safeguards inde-pendent of any statute -- including, but not limited to, those identified in this Amended Com-plaint.

134.    Each Defendant's violation of its duty of care directly and proximately caused Plaintiffs' harm.

135.    Specifically, upon information and belief, the Shooter would not have had access to the Rifle and could not have used it to perpetrate the Attack but for each Defendant's viola-tions of their duty of care by knowingly breaking one or more/relevant firearms laws and/or fail-ing to institute reasonable safeguards in regards to the manufacture, marketing, distribution and sale of firearms like the Rifle.

136.    A mass shooting like the Attack in which an individual like the Shooter uses a firearm like the Rifle to inflict catastrophic harm on parties like the Plaintiffs is a natural and foreseeable consequence of Defendants' violations of the relevant standard of care

137.    As a direct and proximate result of Defendants' misconduct, Plaintiffs have suf-fered, and continue to suffer, great pain of mind and body, shock, severe, and persistent emo-tional distress, physical manifestations of emotional distress, loss of enjoyment of life, loss of earnings and earning capacity, and incurred substantial expenses for medical psychological

treatment, therapy and counseling and other economic and/or noneconomic damages in amounts in excess of the jurisdictional limits of this Court.

138.    Plaintiffs are entitled to relief under a theory of negligence.

139.    The aforementioned statutory violations (and violations of any other relevant safety statutes) establish a prima facie case of Defendants' negligence.

## THIRD CAUSE OF ACTION
## PUBLIC NUISANCE
## (AGAINST ALL DEFENDANTS)

140.    Plaintiffs incorporate each allegation set forth in all preceding paragraphs of this Amended Complaint as if set forth in full herein.

141.    California defines a nuisance as anything which is "injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway." Cal. Civ. Code § 3479.

142.    "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." § 3480.

143.    Defendants, like all commercial parties targeting the California market either directly or indirectly with their products, were under an obligation to avoid conduct creating a public nuisance in California.

144.    Defendants, upon information and belief, intentionally violated and continue to violate this duty by channeling large numbers of firearms – including especially dangerous

WASR-10 assault rifles – into the California criminal market through reckless and/or unlawful business practices including, but not limited to, those described in this Amended Complaint.

145.    This directly and foreseeably interferes with the health, safety, and enjoyment of life and property of all California residents by dramatically increasing the prevalence of unlawful acts of gun violence including, but not limited to, mass shootings like the Attack.

146.    Plaintiffs suffered a unique and distinct harm different than that faced by other members of the public as a direct and proximate consequence of the nuisance created by Defendants, such that the nuisance was "specially injurious" to these Plaintiffs. Cal Civ Code § 3493.

147.    Defendants have, upon information and belief, persisted in their course of conduct creating a nuisance following the attack and continue their misconduct at the time of the filing of this Amended Complaint.

148.    As a direct and proximate result of Defendants' misconduct, Plaintiffs have suffered, and continue to suffer, great pain of mind and body, shock, severe  and  persistent  emotional distress, physical manifestations of emotional distress, loss of enjoyment of life, loss of earnings and earning capacity, and incurred substantial expenses for medical psychological treatment, therapy and counseling and other economic and/or noneconomic damages in amounts in excess of the jurisdictional limits of this Court.

149.    Vermont law assigns liability for public nuisance where defendants "knew or should have known at the time [that their actions] would necessarily cause an unreasonable interference with public health, safety, or peace." *See Gross v. Turner*, 195 A.3d 654, 661 (Vt. 2018), *citing Restatement (Second) of Torts* § 821B (1979).

150. Upon information and belief, Defendants knew or should have known at the time that their actions would necessarily cause an unreasonable interference with public health, safety, or peace.

151. Plaintiffs are entitled to relief under a theory of nuisance.

152. Because of the ongoing nature of the nuisance created by Defendants, this relief may incorporate both monetary damages for the harm the Plaintiffs have already suffered and injunctive relief against Defendants requiring cessation or reform of Defendants' negligent and unlawful business practices contributing to the nuisance.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully request a jury trial.

## **REQUESTED RELIEF**

WHEREFORE, Plaintiffs respectfully pray for judgment and damages against Defendants as follows:

1. for general damages in the sum according to proof and in an amount in excess of the jurisdictional limits of this Court;

2. for special and economic damages;

3. for punitive damages;

4. for loss of earnings;

5. for interest provided by law;

6. for all statutorily allowed damages;

7. for applicable restitution;

8. for an injunction requiring all defendants to abate the public nuisance they have cre-
   ated by stopping the provision of WASR-10 firearms like the Rifle to the public in
   violation of relevant statutes such as those identified herein and/or without reasonable
   safeguards to prevent their misuse;

9. for reasonable attorney fees and costs of suit incurred; and

10. for such other and further relief as this Court deems proper.

Dated _July 27, 2022_

### BRADY

/s/ Philip Bangle
Philip Bangle (pro hac vice to be applied for)
*Lead Counsel*
840 First Street NE
Suite 400
Washington, DC 20002
202-370-8111
pbangle@bradyunited.org

### POWERS & POWERS P.C.

Adam L. Powers Esq.
*Local Counsel*
1205 Three Mile Bridge Road
Middlebury, Vermont 05753
802-388-2211
adam@powerslawvt.com