UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

WENDY TOWNER; et al.,            )
                                 )
        Plaintiffs,              )
                                 )
        v.                       )    Case No. 2:22-cv-145
                                 )
CENTURY ARMS, INC., and          )
ROMARM, S.A.,                    )
                                 )
        Defendants.              )

## OPINION AND ORDER

On July 28, 2019, a person armed with a semi-automatic rifle opened fire at a garlic festival in Gilroy, California, killing three people and wounding twelve others. Plaintiffs, a group that includes individuals injured by the attack and persons whose loved ones were either injured or killed, bring this civil action against the distributor and manufacturer of the rifle. The distributor, Defendant Century Arms, Inc. ("Century Arms"), has filed a motion to dismiss. For the reasons set forth below, the motion is denied.

## Factual Background

This case arises out of a 2019 mass shooting in California. The weapon used in the shooting was a WASR-10 rifle legally purchased by the shooter from a gun dealer in Nevada. That weapon is banned in California.

Plaintiffs are allegedly California residents. Defendant Romarm, S.A., a firearms manufacturer operating in Romania, allegedly manufactured the WASR-10 rifle used in the attack. Defendant Century Arms is a firearms manufacturer incorporated in Vermont and headquartered in Florida. Century Arms is Romarm, S.A.'s sole distributor of WASR-10s in the United States.

The Complaint alleges that Defendants are engaged in a scheme that involves Century Arms breaking down, modifying, and reassembling WASR-10 assault rifles. The Complaint further alleges that Defendants' decisions in designing, marketing, pricing, and distributing WASR-10s directly and foreseeably contributed to Plaintiffs' injuries. Specifically, Plaintiffs contend that the model of WASR-10 used in the attack has design features that make it particularly lethal in the context of a mass shooting but have little or no benefit to civilian users employing WASR-10s for legal ends. Plaintiffs also claim that Defendants fostered an illegal secondary market for WASR-10s among California-based criminals by intentionally flooding the Nevada market with more WASR-10s than that state's market could bear. The Complaint alleges Defendants had actual knowledge that WASR-10s were being illegally trafficked from Nevada into California, that the weapons were being used in crimes in

California, and that Defendants continued to engage in these practices despite that knowledge.

Plaintiffs filed this action on July 28, 2022, asserting causes of action for product liability, negligence, and public nuisance. Century Arms now moves to dismiss claiming the action is untimely; is barred under Nevada law; is preempted by a federal statute; and fails to state plausible claims. Plaintiffs oppose the motion.

## Discussion

### I.  Motion to Dismiss Standard

Century Arms submits its motion to dismiss pursuant to Federal Rules of Civil Procedure 8(a)(2) and 12(b)(6). Rule 8(a)(2) dictates that a complaint need only contain "a short and plain statement ... showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a claim that does not meet this pleading standard for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

On a motion filed under Rule 12(b)(6), a court accepts as true the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008). Nonetheless, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are inadequate.

3

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Also, "[t]he tenet that a court must accept as true" a complaint's factual allegations does not apply "to legal conclusions." *Iqbal*, 556 U.S. at 678 (alterations omitted).

To survive dismissal, a complaint must allege sufficient facts to state a plausible claim. *Twombly*, 550 U.S. at 570. A claim is plausible when the plaintiff pleads facts to support the reasonable inference that the defendant has acted unlawfully. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). A reviewing court must "draw on its judicial experience and common sense" to determine plausibility. *Id.* at 679 (citation omitted).

## II.  Timeliness

Century Arms first challenges the timeliness of the Plaintiffs' claims. The primary issue is whether to apply Vermont's three-year statute of limitations for personal injury actions, as opposed to a two-year statute of limitations under either Nevada or California law. If the Court applies Vermont's limitations period, Plaintiffs' Complaint is timely. The Complaint is not timely under the Nevada and California limitations periods.

A federal court sitting in diversity applies the choice of law rules of its forum state. *AEI Life LLC v. Lincoln Benefit*

*Life Company*, 892 F.3d 126, 132 (2d Cir. 2018) (citing *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012). In *Jacques v. Jacques*, 128 Vt. 140 (1969), the Vermont Supreme Court held that Vermont's statutes of limitation apply if an action is properly brought in the state. Specifically, the court stated:

> Statutes of limitation affect the remedy rather than
> the right. And this Court has held that a cause of
> action which accrued in a foreign jurisdiction could
> not be maintained here after the time limited in our
> statute had expired. Conversely, if the action is
> properly brought here, and within the time limitation
> of our statute, it may be maintained even though time
> has run out at the place where the action arose.

*Jacques*, 128 Vt. at 141-42. The Vermont Supreme Court's holding was unqualified as to the type of action being brought.

In 2004, the Vermont Supreme Court reiterated its holding from *Jacques* in *Marine Midland Bank v. Bicknell*, 176 Vt. 389 (2004). *Marine Midland Bank* concerned the enforcement of a foreign judgment in a Vermont court. In determining that the Vermont statute of limitations would apply, the court treated the question as "procedural" and quoted *Jacques* for the proposition that, "[w]hen a cause of action is brought in Vermont, Vermont law determines the accrual date and the limitations period." 176 Vt. at 393; *see also H & E Equipment Services, Inc. v. Cassani Electric, Inc.*, 204 Vt. 559, 566 (2017).

Century Arms argues that *Jacques* is no longer good law, in part because the decision pre-dated publication of the Restatement (Second) of Conflict of Laws, which the Vermont Supreme Court has generally adopted. *See McKinnon v. F.H. Morgan & Co., Inc.*, 170 Vt. 422, 423 (2000). Under the Restatement, a court first determines whether the laws of the interested jurisdictions are in conflict. *See Havill v. Woodstock Soapstone Co.*, 172 Vt. 625, 627 (2001). If there is a conflict, the court then determines "whether a specific section of the Restatement applies to the particular action or issue in dispute." *McKinnon*, 170 Vt. at 424.

In this case, there is a conflict between the law of Vermont and the laws of Nevada and California with respect to limitations periods for personal injury cases. Section 142 of the Restatement provides:

> In general, unless the exceptional circumstances of the case make such a result unreasonable: (1) the forum will apply its own statute of limitations barring the claim. (2) The forum will apply its own statute of limitations permitting the claim unless: (a) maintenance of the claim would serve no substantial interest of the forum; and (b) the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence.

Restatement (Second) of Conflicts § 142 (1988). If the Court applies the Restatement (Second) to resolve this issue, it will

therefore have to determine whether Vermont has any "substantial interest" in the maintenance of the action.

Even assuming, as Century Arms argues, that *Jacques* is no longer good law, the Vermont statute of limitations applies in this case. Century Arms' arguments to the contrary are unavailing. Specifically, Century Arms contends that because limitations periods are intended to protect in-state defendants and courts from stale claims, Vermont has no substantial interest in permitting a claim where its own limitations period would allow the action to proceed, while the California and Nevada statutes would not. But Vermont's interest in protecting resident defendants from stale claims does not preclude it from having other interests; after all, if a forum state by default has no interest in the maintenance of the claim where (1) the defendant is a resident and (2) the law of an alternate possible forum has a shorter statute of limitations, Section 142 would presumably say so. *See Commonwealth of Puerto Rico v. Franklin California Tax-Free Trust*, 579 U.S. 115, 127 (2016) (noting that courts presume that drafters do not "hide elephants in mouse holes").

Particularly relevant here is that states have "a strong and obvious interest in 'regulating the conduct of persons within its territory.'" *Matson by Kehoe v. Anctil*, 979 F. Supp. 1031, 1035 (D. Vt. 1997) (quoting Restatement (Second), § 145,

Comment on Subsection (1)(d)); *Martineau v. Guertin*, 170 Vt. 415, 422 (2000) (noting that a forum has an interest in a legal action when the allegedly wrongful conduct occurred in the forum). Indeed, a state has a substantial interest in holding resident defendants to account for wrongful conduct that occurs within the forum, even when the plaintiff is not a resident and the harm occurred in a different state. *See, e.g., Holbrook v. Boston Scientific Corp.*, 487 F. Supp. 3d 100, 106 (D. Mass. 2020) (holding that Massachusetts' statute of limitations would apply where plaintiff was a Louisiana resident injured by defendant's product in Louisiana, but Massachusetts had a substantial interest in seeing a resident defendant be held accountable for wrongful conduct undertaken in Massachusetts); *Fresenius Granuflo/NaturaLyte Dialysate Prods. Liab. Litig.*, 76 F. Supp. 3d 294, 306, 306 (D. Mass. 2015) (same).

Here, although the injury itself did not occur in Vermont, much of the allegedly tortious and illegal conduct did. Plaintiffs have alleged that Century Arms is incorporated in Vermont; that it imported, modified, and reassembled the rifle in question; that it engaged in unlawful and negligent advertising practices; and that it places WASR-10s into the stream of commerce. Consequently, Vermont has a substantial interest in maintaining this litigation, its statute of

limitations applies, and Plaintiffs' personal injury action is timely brought.

Century Arms also argues that, to the extent Plaintiffs are bringing claims for wrongful death, they are barred by Vermont's two-year wrongful death limitations period. *See* 14 V.S.A. § 1492. While the general limitations period in Vermont is two years, 14 V.S.A. § 1492(e) provides that, "if the death of the decedent was caused by an intentional act constituting murder, the action may be commenced within seven years after the discovery of the death of the decedent." Similarly, 14 V.S.A. § 1492(a) provides that, "[i]f the death of the decedent occurred under circumstance such that probable cause is found to charge a person with homicide, the action shall be commenced within seven years after the discovery of the death of the decedent or not more than two years after the judgment in that criminal action has become final, whichever occurs later."

Plaintiffs argue that, under 14 V.S.A. § 1492(e), their action can proceed under the seven-year statute of limitations because the wrongful deaths at issue here were caused by intentional acts constituting murder. Century Arms submits that 14 V.S.A. § 1492(e) applies only when the defendant in the wrongful death suit is the same party who committed the intentional act constituting murder. Century Arms also urges the Court to read § 1492(e) in conjunction with 14 V.S.A. §

1492(a), and to apply the seven-year limitations period only when a criminal action is actually instituted.

The Vermont Supreme Court has stated that, "[w]hen interpreting a statute, our fundamental objective is to discern and implement the intent of the Legislature." *In re MacIntyre Fuels, Inc.*, 175 Vt. 613, 615 (2003). "We interpret the statute as a whole, looking at the reason and spirit of the law and its consequences and effects to reach a fair and rational result." *In re Margaret Susan P.*, 169 Vt. 252, 262 (1999). "If the statutory language is absolutely clear and unambiguous, we generally restrict ourselves to the plain meaning of that language, but if any question remains as to the intent underlying the statute, we also look at 'the legislative history and circumstances surrounding its enactment, and the legislative policy it was designed to implement." *In re MacIntyre Fuels, Inc.*, 175 Vt. at 615-16 (quoting *Perry v. Med. Practice Bd.*, 169 Vt. 399, 406 (1999)). Thus, "[w]hen the plain meaning of statutory language appears to undermine the purpose of the statute, we are not confined to a literal interpretation, but rather must look to the broad subject matter of the statute, its effects and consequences, and the purpose and spirit of the law to determine legislative intent." *Town of Killington v. State*, 172 Vt. 182, 189 (2001).

Here, the Court finds that the language of the statute and the legislative history support Plaintiffs' reading.  The plain language of 14 V.S.A. § 1492(e) does not limit the application of the seven-year statute of limitation to cases in which the civil defendant and alleged murderer are one and the same.  Nor does it limit the application of the seven-year statute of limitations to cases in which a criminal action has been commenced.  However, as noted by Century Arms, reading section (e) in conjunction with section (a) arguably creates ambiguity as to the Legislature's purpose in adopting subsection (e).  The Court therefore turns to the legislative history.

The available legislative history supports Plaintiffs' position that a civil action need not be brought against the alleged perpetrator of a murder for the seven-year statute of limitation to apply.  The relevant language was added to the wrongful death statute in 1996.  The bill originated in the Senate Judiciary Committee, and the committee originally drafted the statute to read as follows:

> (e) Notwithstanding subsection (a) of this section, an action to recover damages for a death caused by an intentional act constituting murder *may be commenced against the alleged perpetrator* within 15 years after the death of the decedent.

Vermont State Legislature, Journal of the Senate (Feb. 1, 1996), http://www.leg.state.vt.us/docs/1996/journal/SJ960201.htm (available at: https://perma.cc/Q4C7-UAR8) (emphasis supplied).

In the Senate Judiciary Committee's hearing on January 24, 1996, the committee discussed whether to include this language, noting that there might be cases in which parties other than the alleged murderer were involved in the wrongful death. Statute of Limitations for Wrongful Death: Senate Debate on S. 60, 1996 Vt. Leg. (Jan. 24, 1996) (available from Vermont State Archives & Records).[1]  When the House Judiciary Committee reviewed the Senate Judiciary Committee's draft bill, it removed this limiting language.  Statute of Limitations for Wrongful Death: Hearing on S. 60 Before the H. Jud. Comm., 1996 Vt. Leg. (Apr. 4, 1996) (available from Vermont State Archives & Records).  It is therefore plain from the record that the Legislature specifically contemplated whether to limit the application of the seven-year statute of limitations to civil actions against the alleged murderer.  Because the exclusionary language was not included in the statute, the Court finds that the seven-year statute may apply in cases such as this.

Century Arms further argues that a criminal action must have been instituted for the longer statute of limitation to apply.  In both the Senate and House hearings on proposed

---

[1] The committee specifically considered *Leo v. Hillman*, 164 Vt. 94 (1995), a case in which the plaintiffs brought a wrongful death action against the alleged murderer's psychologist and the psychiatric clinic where the alleged murderer was receiving treatment.

amendments, the Legislature discussed how the statute would
operate in cases in which the State's Attorney never institutes
criminal proceedings.  In those discussions, both committees
determined that a civil plaintiff could nevertheless benefit
from the seven-year statute of limitations if they proved by a
preponderance of the evidence in the civil action that the death
was caused by an intentional act constituting murder.  Senate
Debate on S. 60 and Hearing on S. 60 Before the H. Jud. Comm.
The Court therefore finds that, to the extent a wrongful death
limitations period applies in this case, Plaintiffs' action is
timely.

## III.  Choice of Law for Substantive Issues

### A.    Choice of Law Analysis

Section 146 of the Restatement (Second) of Conflicts of
Laws provides that, in personal injury actions, "the local law
of the state where the injury occurred determines the rights and
liabilities of the parties, unless, with respect to the
particular issue, some other state has a more significant
relationship under the principles stated in § 6."  Accordingly,
the default under the Restatement would be California law, as
that is the state where the injuries occurred.  Defendants argue
instead that Nevada has the most significant relationship to the
case.  If the Court determines that Nevada law applies, each of
Plaintiffs' causes of action would arguably be barred by Nevada

Revised Statute 41.131 which, as explained below, generally prohibits lawsuits against gun manufacturers and distributors.

The following principles are considered in determining whether a forum's contacts are significant enough to override the presumption that California law applies:

> (a) The needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflicts of Law § 6. "The first three (or perhaps four) of these general principles carry the greatest weight in the field of tort law." *McKinnon*, 170 Vt. at 425.

> [Courts] also consider the following contacts specifically applicable to tort cases:

> (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.

*Rodrigue v. Illuzzi*, 216 Vt. 308, 321-22 (2020) (quoting Restatement (Second) of Conflicts of Law § 145(2)).

The contacts specific to tort claims "are to be evaluated according to their relative importance with respect to the particular issue." Restatement (Second) of Conflicts of Law §

14

145.  The Vermont Supreme Court has indicated that the place of injury and the place of misconduct are more important when the conflict concerns the relevant standard of care, and are less important when the issue is one of loss allocation or limitation of damages.  *See Myers v. Langlois*, 168 Vt. 432, 436 (1998). The place of injury is also less important when it bears "little relationship to the parties," *Amiot v. Ames*, 166 Vt. 288, 292 (1997), or is "fortuitous," *Martineau*, 170 Vt. at 420.  In weighing these factors, it is also important to consider where "the social and economic consequences of the [injury] will be felt."  *Id.*  Finally, when a choice-of-law question involves two or more states with the same law governing a particular issue, those states' respective contacts must be grouped in determining whether the conflicting states' contacts are significant enough to override the presumption in favor of applying the law of the state where the injury occurred.  *Id.* (citing Restatement (Second) of Conflicts of Law § 145, cmt. i).

The conflict of law presented in this case is a Nevada statute that bars certain causes of action against gun manufacturers and distributors.  Nevada Revised Statute 41.131 reads in relevant part:

> 1.   No person has a cause of action against the manufacturer or distributor of any firearm or ammunition merely because the firearm or ammunition was capable of causing serious injury, damage or death, was discharged and proximately caused serious

> injury, damage or death.  This subsection is
> declaratory and not in derogation of the common law.
>
> 2.   This section does not affect a cause of action
> based upon a defect in design or production. The
> capability of a firearm or ammunition to cause serious
> injury, damage or death when discharged does not make
> the product defective in design.

California and Vermont have no similar statutes.

Applying the factors laid out in the Restatement, both California and Nevada have significant interests in this litigation.  Nevada's primary contact is that it was the place where the rifle was sold.  As Century Arms argues, Nevada has an interest in avoiding an impediment to lawful gun sales in the state.  Applying Nevada law would thus arguably support the needs of the interstate system by ensuring that injuries occurring outside of Nevada cannot affect commerce or lawful gun ownership within Nevada.

The Court notes, however, that Nevada has no legitimate interest in facilitating gun sales to California-based criminals who cannot lawfully own WASR-10s.  To the extent that applying California's duty of care would inhibit the sale of guns to Californians, while at the same time allowing Nevada residents to continue accessing those same guns, the application of California law would not undermine Nevada's interests.  In analogous circumstances, the Vermont Supreme Court has reasoned that a jurisdiction's interests should be given less weight when

they would not be undermined by the application of foreign law. *See Martineau*, 170 Vt. at 420 ("We recognize that Quebec has an interest in the present dispute because the social and economic consequences of the accident will be felt in Quebec, the residence of the plaintiffs.  On the other hand, there is no indication that allowing plaintiffs to seek compensation in Vermont will undermine or interfere with Quebec's no-fault system of compensation.").

Century Arms also argues that applying Nevada law "protects the justified expectations of the parties, as Century would not expect that it would be subject to California law for a product which it does not – and cannot – sell to California."  ECF No. 14 at 9.  The Complaint, however, allows for the inference that Defendants intentionally oversupplied Nevada with guns with the goal of selling WASR-10s to California residents.  Accepting Plaintiffs' allegations as true, Century Arms could have foreseen being held to account in a jurisdiction where they are intentionally fueling unlawful gun ownership.

Capital Arms' argument that "Nevada would not want a manufacturer to be sued in another state because someone unilaterally transported [the firearm] into a state where the firearm was not permitted" fails for similar reasons.  *Id.*  On Plaintiffs' version of the facts, Defendants aided and abetted a California-based criminal in illegally possessing a WASR-10 in

17

California.  Again, Nevada has no legitimate interest in facilitating the sale of WASR-10s to California-based criminals.

Turning to California's interests and contacts, the location of the injury has particularly significant weight in this case.  That Plaintiffs were injured in California was not "fortuitous" – the injury occurred in their home state and in a market Defendants allegedly targeted.  *Martineau*, 170 Vt. at 420 (finding that the location of a car accident was not "completely fortuitous" because it occurred on a route between the state in which the parties' families resided and the state in which the parties worked and lived).  Moreover, the conflict of law at issue is the applicable standard of care.  At stake for California is the standard of care applied to a situation in which Defendants' purposeful conduct foreseeably caused, and may continue to cause, injury within California's borders. Application of Nevada law would hinder California's ability to deter gun manufacturers and distributors from engaging in conduct that puts Californians at risk of serious violence.

Other factors similarly weigh in California's favor. First, because Plaintiffs are domiciled in California, much of the social and economic impact of the injury will be felt there. Additionally, applying California law serves the justified expectations of the Plaintiffs, who were harmed in their own state and would thus expect the law of that state to apply.

18

Admittedly, Defendants were more likely to expect to be sued in
Nevada but, as discussed above, they could have foreseen that
California law would apply to a case in which California
residents were harmed by distribution and marketing practices
designed to target the California market.  As for the location
of the harmful conduct, it is true than none of Defendants'
conduct giving rise to the injury actually occurred in
California.  Yet, accepting Plaintiffs' version of the facts and
drawing all reasonable inferences in their favor, Defendants
were targeting the California market by oversupplying rifles in
Nevada.  Thus, although Defendants' injurious conduct did not
occur in California, it was specifically targeted at California.

    As for the place where the parties' relationship is
centered, this factor will not be accorded significant weight.
There was no commercial or contractual relationship between
Plaintiffs and Defendants.  Plaintiffs have no connection to
Nevada.  Consequently, the relationships among the parties
center on California given that Defendants were allegedly
targeting the California market, and California is where
Plaintiffs resided.

    Century Arms' reply memorandum asserts that the shooter was
a Nevada resident who lawfully purchased a gun in Nevada and
chose to commit the shooting in California.  For choice of law
purposes, those facts do not fully counter the allegations that

19

Defendants' distribution, marketing, and pricing practices intentionally and foreseeably facilitated the unlawful possession of a WASR-10 in California.  Moreover, the assailant being a Nevada resident is not incompatible with him being a "California-based criminal," as Plaintiffs allege in their complaint.  Nevada has no legitimate interest in facilitating firearms sales, even to Nevada residents, when the buyers' intent is, from the start, to transport those guns to the California market.

In sum, even accepting Defendants' allegations about the shooter as true, California still has significant interests and contacts with this case.  As discussed, the place of injury takes on increased significance when the conflict of law concerns the appropriate duty of care.  The shooting took place in California, Plaintiffs are California residents, and much of the social and economic impact of Defendants' alleged misconduct is felt in California.  The Court will therefore apply California substantive law.

### B.   Constitutional Challenges

Century Arms argues that the application of California law would violate the Tenth and Fourteenth Amendments.  With respect to the Tenth Amendment, Century Arms contends that applying California law would result in the direct regulation of commerce occurring wholly outside of California's borders and would,

therefore, violate the dormant Commerce Clause.  As to the
Fourteenth Amendment, Century Arms argues that applying
California law would penalize conduct that is lawful in another
state and would therefore violate the Due Process Clause.
Specifically, Century Arms submits that Plaintiffs have
requested monetary damages based on lawful firearm sales in
other states and have requested that the Court enjoin Defendants
from lawfully selling WASR-10s in Nevada.

       **1.**   **Dormant Commerce Clause**

The Commerce Clause of the Constitution grants Congress the
power to regulate interstate commerce.  Art. I, § 8, cl. 3.
"Although the Clause thus speaks in terms of powers bestowed
upon Congress, the Court long has recognized that it also limits
the power of the States to erect barriers against interstate
trade." *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 35
(1980).  The primary inquiry in a Commerce Clause challenge is
whether the state law at issue "discriminates against interstate
commerce." *Oregon Waste Systems, Inc. v. Dep't of Env't Quality
of State of Oregon*, 511 U.S. 93, 99 (1994).

In the context of the Commerce Clause, "'discrimination'
simply means differential treatment of in-state and out-of-state
economic interests that benefits the former and burdens the
latter." *Id.*  When a state law is facially discriminatory, "it
is virtually *per se* invalid." *Id.*  When a law is facially

neutral, the "law's practical effects may also disclose the
presence of a discriminatory purpose." *Nat'l Pork Producers
Council v. Ross*, 598 U.S. 356, 377 (2023).  In such
circumstances, the Supreme Court has used a balancing test,
first articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137,
142 (1970), to determine if the law at issue is in fact
discriminatory.  *Nat'l Pork Producers Council*, 598 U.S. at 377-
78 (clarifying that the *Pike* test is not a departure from the
Court's "core dormant Commerce Clause precedents," which focus
on whether a law is discriminatory in nature).

Century Arms argues that the injunction Plaintiffs seek
would violate the Commerce Clause because it would have the
effect of "directly regulating commerce occurring wholly outside
the enacting State's borders."  ECF No. 14 at 21.  Plaintiffs
have requested that this Court issue an injunction "requiring
all defendants to abate the public nuisance they have created by
stopping the provision of WASR-10 firearms like the Rifle to the
public in violation of relevant statutes such as those
identified herein and/or without reasonable safeguards to
prevent their misuse."  ECF No. 1 at 30.  Though such an
injunction would indeed impact commerce in Nevada and in
California's other border states, the Court finds that it would
not run afoul of the Commerce Clause.

As the Supreme Court recently clarified in *National Pork Producers Council*, an exercise of state power does not violate the Commerce Clause simply because it affects commerce occurring entirely outside the state's borders. 598 U.S. at 374-75. To succeed on its Commerce Clause arguments, Century Arms would need to show either that the injunction facially discriminates against interstate commerce, *Oregon Waste Systems*, 511 U.S. at 99, or that "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits," *Pike*, 397 U.S. at 142. It has not established either point.

As for facial discrimination, the Supreme Court has defined discrimination as "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Systems*, 511 U.S. at 99. In this case, Plaintiffs' injunction has nothing to do with protecting California's economic interests or privileging them over out-of-state economic interests. While the interests at stake for Nevada may be economic, California's interest is public safety.

With respect to the proposed injunction's burden on interstate commerce, the Supreme Court has established that the Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127-28 (1978). Nor does the Commerce Clause protect "the particular

23

structure or methods of operation in a retail market." *Id.* at
127.  Thus, Plaintiffs' request for an injunction would not
violate the Commerce Clause simply because it would affect
Defendants' business or require them to alter their methods of
retail.  This point is emphasized by the fact that courts
regularly apply the law of the state where an injury occurred,
even when the harm-causing conduct is economic in nature and
occurred entirely in a different state.  *See, e.g., McKinnon*,
170 Vt. at 422 (applying Quebec law to a case in which
plaintiff, a Quebec resident, purchased a bicycle from the
defendant in Vermont and had the defendant repair the bicycle in
Vermont but where her injury from the allegedly negligent repair
occurred in Quebec).

Failing there, Century Arms would need to show that
Plaintiffs' requested injunction would substantially burden
interstate commerce as a whole and that such burden would be
"clearly excessive in relation to the putative local benefits."
*Pike*, 397 U.S. at 142.  There is nothing to suggest at this
early stage of litigation that such a burden would result.  And,
again, the Restatement's presumption in favor of the law of the
place where the injury occurred suggests that the health and
safety interests of that jurisdiction will generally outweigh
the economic impacts on the state where the harm-causing conduct
occurred.

24

The Third Circuit explicitly recognized — and embraced —
this implication of the Restatement in *Suchomajcz v. Hummel
Chemical Co., Newark, New Jersey*, 524 F.2d 19 (3d Cir. 1975).
In that case, Pennsylvania plaintiffs were injured by the
conduct of a New Jersey business that did not do business in
Pennsylvania, and all of the allegedly tortious conduct occurred
in New Jersey.  The Third Circuit noted that, if the two states'
laws differed as to whether the defendant's activities were
tortious, "[t]he interest of one state in protecting its
citizens against harm caused by [the defendant's] sales would be
offset by the other state's interest in promoting its industries
by not imposing liability."  *Id.* at 23.  Notwithstanding New
Jersey's interests in promoting its industries, the Third
Circuit held that "under these circumstances Pennsylvania would
apply its tort law, the law of the state where the injury
occurred."  *Id.* at 23-24.  Similarly, in *Ileto v. Glock, Inc.* —
a case in which California residents sued gun manufacturers for
risky distribution practices — the Ninth Circuit rejected the
defendant's Commerce Clause argument, easily finding that
California's "interest in protecting the health and safety of
its citizens is clearly legitimate, and whatever indirect burden
an award of damages to the plaintiffs might have on the
defendants, it does not approximate the public interest in

25

protecting the health and safety of California's citizens."  349
F.3d 1191, 1217 (9th Cir. 2003).

The Court therefore finds that Century Arms has failed, at
this stage in the case, to establish a Commerce Clause
violation.

### 2. Fourteenth Amendment's Due Process Clause

In *BMW of North America, Inc. v. Gore*, the Supreme Court
held that a state "does not have the power . . . to punish [a
defendant] for conduct that was lawful where it occurred and
that had no impact on [the state] or its residents."  517 U.S.
559, 573 (1996).  This holding was grounded in the long-
established principle that "[t]o punish a person because he has
done what the law plainly allows him to do is a due process
violation of the most basic sort."  *Id.* at 573 n.19.  The Court
further held that this principle is violated when a court or
jury awards civil damages with the "intent of changing the
tortfeasors' lawful conduct in other states."  *Id.* at 573.

Relying on *BMW of North America*, Century Arms argues that
applying California law in this case would violate the Due
Process Clause because (1) none of its allegedly tortious or
unlawful actions occurred in California, and (2) its actions
were not tortious or unlawful in Nevada.  Thus, they argue,
imposing liability on them would amount to punishing them for
conduct that was not unlawful where it occurred.

*BMW of North America* is distinguishable.  In that case, the jury's award of damages violated the Due Process Clause in large part because it was aimed at protecting consumers in states where BMW's conduct was not unlawful.  Here, Plaintiffs seek an award aimed at protecting California residents, *i.e.*, residents of a state in which Defendants' alleged conduct *was* unlawful. *BMW of North America* itself made this distinction, holding that a state "does not have the power . . . to punish [a defendant] for conduct that was lawful where it occurred and that had no impact on [the state] or its residents."  517 U.S. at 572-73. By contrast, when a state and its residents are impacted, it cannot be left helpless to protect its residents simply because a tortfeasor is careful not to step foot in the state.  *See id.* at 572.

Again, modern conflicts-of-law principles reflect this reality.  Under the Restatement (Second) of Conflicts of Law, the law of the jurisdiction where the injury occurred generally governs in personal injury cases, even when the harm-causing conduct and the actual injury occur in different states:

> On occasion, conduct and personal injury will occur in different states.  In such instances, the local law of the state of injury will usually be applied to determine most issues involving the tort (see § 145, Comments d-e, and §§ 156-166 and 172).  One reason for the rule is that persons who cause injury in a state should not ordinarily escape liability imposed by the local law of that state on account of the injury.

Restatement (Second) of Conflicts of Laws § 146, cmt. e.  This
comment is explicitly concerned with scenarios, such as the one
in this case, where a tortfeasor would escape liability for an
injury simply because the jurisdiction in which the conduct
occurred does not recognize the tort.  This concern is
emphasized in Restatement § 156, which affirms that, in
determining the tortious character of conduct, "[t]he applicable
law will usually be the local law of the state where the injury
occurred," even when the conduct and harm occur in different
states.  Restatement (Second) of Conflicts of Laws § 156(2), §
156 cmt. d.

Courts regularly apply these principles without running
afoul of the Due Process Clause.  Once again, *Hummel* is
instructive and in many important respects analogous to the case
at bar.  In that case, the defendant was a New Jersey company
that manufactured chemical products which, in and of themselves,
were harmless.  However, the defendant sold these chemicals to
two other New Jersey companies that the defendant either knew or
had reason to know would use those chemicals "to manufacture and
ship firecracker assembly kits in violation of federal law."
524 F.2d at 22.  An individual then bought a firecracker
assembly kit from one of those companies and ultimately
abandoned part of the kit in a bottle at a park in Pennsylvania.
*Id.* at 22.  Two days later, someone threw a match into the

28

bottle, causing an explosion that killed two children and
injured four others. *Id.* The plaintiffs sued the defendant for
common law negligence for recklessly and carelessly selling
hazardous and dangerous material, for supplying without adequate
warning a product that the defendant knew was likely to be
dangerous for its intended use, and under a theory of strict
liability for abnormally hazardous activities. *Id.*

On these facts, the Third Circuit held that Pennsylvania
law, not New Jersey law, should apply. The Third Circuit began
by noting that, under the Restatement (Second) of Conflicts of
Laws, "the law determining whether the actor's conduct was
tortious will usually be the law of the state where the injury
occurred." 524 F.2d at 23. The court recognized that, if a
true conflict of law existed as to whether the defendant's
activities were tortious, it necessarily meant that one of those
states did not consider the defendant's conduct to be unlawful.
*Id.* Nevertheless, the Third Circuit held that "under these
circumstances Pennsylvania would apply its tort law, the law of
the state where the injury occurred." *Id.* at 23-24. That is,
the court assumed that, even if the defendant's actions were
neither tortious nor unlawful in New Jersey (where they
occurred), it should nevertheless apply Pennsylvania law.

*Hummel* is instructive because the defendant in that case,
like Defendants here, did not directly engage in any tortious

29

acts in the state where the injury occurred.  Moreover, the
defendant in *Hummel* did no business in Pennsylvania, just as
Defendants do not sell any non-compliant WASR-10s in California.
And, as in *Hummel*, it is appropriate to apply the law of the
place where the injury occurred because, accepting Plaintiffs'
well-pleaded facts as true, Defendants' conduct was tortious
under California law and foreseeably led to harm in California.
If Defendants' conduct had no impact on California or its
residents, applying California law would indeed pose
constitutional problems.  But that is not this case, and the
Court finds no constitutional bar to applying California law.

**V.    Federal Preemption under the PLCAA**

Century Arms next argues that Plaintiffs' claims are
preempted by the Protection of Lawful Commerce in Arms Act
(PLCAA), 15 U.S.C. §§ 7901-7903.  The PLCAA preempts certain
civil legal actions against gun manufacturers, sellers, and
trade associations.  The PLCAA also has exceptions.  Century
Arms contends that the PLCAA preempts products liability
actions, general negligence claims, and public nuisance claims
and, further, that the PLCAA's "predicate exception" is not
applicable to this case.  Plaintiffs argue that the predicate
exception, explained below, does apply.

The predicate exception under the PLCAA provides that the
statute does not bar "an action in which a manufacturer or

seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii). The first step in analyzing whether the predicate exception applies is to determine whether the alleged legal violation was of a statute "applicable" to the sale or marketing of the product. The Second Circuit has held that the term "applicable to" "encompass[es] statutes (a) that expressly regulate firearms, or (b) that courts have applied to the sale and marketing of firearms; and . . . does encompass statutes that do not expressly regulate firearms but that clearly can be said to implicate the purchase and sale of firearms." *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 404 (2d. Cir. 2008).

Generally, "the phrase 'knowingly violates' requires knowledge of the facts and attendant circumstances that comprise the violation of [a] statute, not specific knowledge that one's conduct is illegal." *United States v. Weintraub*, 273 F.3d 139, 147 (2001); *see also Dixon v. United States*, 548 U.S. 1, 5 (2006). Although the Second Circuit has not addressed the meaning of that phrase in the context of the PLCAA, the Southern District of New York held that the same definition of "knowingly violates" applies to the PLCAA's predicate exception. *New York v. Arm or Ally, LLC*, 718 F. Supp. 3d 310, 330 (S.D.N.Y. 2024).

That court also endorsed applying traditional notions of "proximate cause." *Id.* at 331-32 (citing *Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, 91 F.4th 511 (1st Cir. 2024)). The predicate exception allows a plaintiff to bring common law claims that would otherwise be barred by the PLCAA "as long as there is a predicate statutory violation that proximately causes the harm." *Estados Unidos Mexicanos*, 91 F.4th at 527.

Plaintiffs allege violations of California Penal Code § 30605(a), which bans the possession of assault weapons. California Penal Code § 30515 includes in its definition of "assault weapons" a "semi-automatic, centerfire rifle that does not have a fixed magazine but has any one" of six different features, including a "folding or telescoping stock" or a "pistol grip that protrudes conspicuously beneath the action of the weapon." Plaintiffs have pled that the rifle at issue in this case was a variant of the AK-47 and that it was a semi-automatic, centerfire rifle without a fixed magazine and with a folding or telescoping stock and/or a pistol grip that protrudes conspicuously beneath the action of the weapon.

The parties do not dispute that the shooter violated California Penal Code § 30605. Century Arms argues that it did not violate Section 30605 as a matter of law because the rifle was sold in Nevada, not California, and was brought into

California by a third party.  Plaintiffs counter that Defendants are liable under an aiding and abetting theory.

Under California law, a person who aids or abets the commission of a crime is liable as a principal.  Cal. Pen. Code § 31.  "[A] person is guilty of aiding and abetting if he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages, or instigates, the commission of the crime."  *Mitchell v. Prunty*, 107 F.3d 1337, 1340 (9th Cir. 1997) (quoting *People v. Beeman*, 35 Cal. 3d 547, 561 (1984)) (internal quotation marks omitted).  Additionally, "[t]o be convicted, an aider and abettor must have criminal intent, and 'the requisite intent to render such aid must be formed prior to or during 'commission of that offense.'" *Mitchell*, 107 F.3d at 1340 (quoting *People v. Cooper*, 53 Cal. 3d 1158, 1164 (1991)).

In arguing that Defendants violated California Penal Code § 30605 as aiders or abettors, Plaintiffs highlight the following factual allegations: (1) Defendants supplied sellers in states surrounding California with "assault weapons," (2) Defendants knowingly supplied those sellers with more firearms than could reasonably be anticipated to be acquired by lawful consumers in those states, (3) Defendants knowingly adopted marketing and

33

pricing strategies that made their guns attractive to California
criminals and encouraged trafficking of such firearms into
California, (4) Defendants knew that there was high demand for
WASR-10s among California criminals, (5) Defendants knew that
California criminals were sourcing WASR-10s from Nevada and
other states surrounding California, (6) Defendants continued to
channel firearms through this distribution network even after
receiving numerous trace requests linking their WASR-10s to
crimes in Mexico and California and after becoming aware through
court cases and news reports that their guns were frequently
used in crimes in Mexico and California, (7) Defendants
benefitted economically from the sale of their guns to criminal
actors California, and (8) the shooter would not have had access
to the rifle but for Defendants' distribution, marketing, and
pricing strategies.

Plaintiffs' position is supported by two seminal cases.
The first, *Direct Sales Co. v. United States*, 319 U.S. 703
(1943), involved a pharmaceutical manufacturer and wholesaler
that sold prescription medications by mail order to doctors
across the United States, including morphine sulphate.  319 U.S.
at 705.  One of those customers, a doctor in South Carolina, was
ordering large quantities of morphine sulphate and illegally
reselling it.  *Id.*  The government's theory for charging the
manufacturer with a conspiracy to violate the Harrison Narcotic

Act was that it sold morphine to the doctor in question "in such
quantities, so frequently and over so long a period that it must
have known he could not dispense the amounts received in lawful
practice and was therefore distributing the drug illegally."
*Id.* "Not only so, but it actively stimulated [the doctor's]
purchases." *Id.* It did so in part by selling its drugs "at
prices considerably lower than were charged by its larger
competitors." *Id.* at 707.

The Supreme Court emphasized that it could adduce knowledge
and intent on the part of the manufacturer because of the
restricted nature of morphine sulphate, which has limited legal
uses. *Id.* at 710. While offering low prices and selling large
quantities of product might be "wholly innocuous or not more
than ground for suspicion in relation to unrestricted goods,
[such factors] may furnish conclusive evidence, in respect to
restricted articles, that the seller knows the buyer has an
illegal object and enterprise." *Id.* at 711. The reason, as the
Supreme Court explained, is that "[m]ass advertising and bargain
counter discounts are not appropriate to commodities so
surrounded with restrictions [as they] do not create new legal
demand and new classes of legitimate patrons, as they do for
sugar, tobacco and other free commodities." *Id.* at 712. "The
primary effect is rather to create black markets . . . and to
increase illegal demand and consumption." *Id.* "The

difference," the Supreme Court explained, "is like that between toy pistols or hunting rifles and machine guns."  *Id.* at 710. In other words, not all products "embody the same capacity, from their very nature, for giving the seller notice the buyer will use them unlawfully." *Id.*

The second significant case is *Estados Unidos Mexicanos*, in which the First Circuit applied the Supreme Court's reasoning in *Direct Sales* to the context of illegal firearms trafficking. The government of Mexico brought an action against gun manufacturers alleging that they were aiding and abetting illegal trafficking of guns into Mexico.  91 F.4th at 529. Mexico's complaint alleged that the manufacturers "were aware of the significant demand for their guns among the Mexican drug cartels, that they can identify which of their dealers are responsible for the illegal sales that give the cartels the guns, and that they know the unlawful sales practices those dealers engage in to get the guns to the cartels."  *Id.* at 530. Further, as in *Direct Sales*, the complaint alleged that the manufacturers continued to sell firearms to

> the very dealers that they know engage in straw sales
> and large-volume sales to traffic guns into Mexico,
> that they design military-style weapons and market
> them as such knowing that this makes them more
> desirable to the cartels, and that they place serial
> numbers on their weapons in a manner that facilitates
> their removal, as is preferred by cartels.

*Id.*  The First Circuit reasoned that, on these facts, it was "not implausible that, as the complaint alleges, defendants engage in all this conduct in order to maintain the unlawful market in Mexico, and not merely in spite of it."  *Id.*

Plaintiffs' allegations are analogous to those in *Direct Sales* and *Estados Unidos Mexicanos*.  As in both of those cases, Plaintiffs allege that Defendants sold a highly regulated commodity in volumes incompatible with their limited legal uses. They also allege that Defendants had actual knowledge that their WASR-10s were being transported to California and were particularly appealing to California criminals.  Plaintiffs further allege that, despite such knowledge, Defendants continued to engage in marketing and pricing strategies that encouraged their illegal transport into California.  Tracking the elements of aiding and abetting under California law, these facts plausibly support a finding that (1) Defendants knew that California-based criminals were buying guns in Nevada with the illegal intent of transporting them into California, (2) Defendants flooded the Nevada market with guns and employed marketing and pricing strategies with the intent of encouraging or facilitating such transport, not merely with indifference that such transport occurs, and (3) Defendants' acts aided the commission of illegal gun possession in California.

Century Arms argues that Plaintiffs failed to allege an illegal sale. But Plaintiffs are not claiming that Defendants aided and abetted distributors' unlawful firearms sales; they are alleging that Defendants aided and abetted unlawful possession of non-compliant WASR-10s in California. Plaintiffs therefore need not allege that the sale was unlawful to prevail. Nor are Plaintiffs arguing that Defendants aided and abetted the shooting itself.

Century Arms notes that it sells a California-compliant version of the WASR-10, which any California citizen can purchase. Plaintiffs claim, however, that Defendants know the non-California-complaint version of the WASR-10 is particularly desirable to criminals and mass shooters because it contains the very features banned by California law, such as the ability to accept high-capacity magazines. Plaintiffs also allege that Defendants not only oversupply Nevada with guns that are particularly attractive to criminals, but that they engage in pricing strategies that encourage California criminals to purchase non-California-compliant WASR-10s. *Id.* at 61.

The Court next turns to the question of whether Century Arms' alleged violation of Cal. Pen. Code § 30605 proximately caused Plaintiffs' harm. In the criminal context, proximate cause concerns whether it was "reasonably foreseeable" that the defendant's actions would cause the harm at issue. *United*

*States v. Felder*, 993 F.3d 57, 68-69 (2d Cir. 2021). "[T]he greater the risk that the defendant's conduct will result in the harm the plaintiff suffered, the more likely that a jury will be allowed to find that such conduct was the cause of that harm." *Gemmink v. Jay Peak Inc.*, 807 F.3d 46, 49 (2d Cir. 2015). "The concept of proximate cause incorporates the notion that an accused may be charged with a criminal offense even though his acts were not the immediate cause of the victim's death or injury." *United States v. Guillette*, 547 F.2d 743, 749 (2d Cir. 1976).

> In many situations giving rise to criminal liability, the death or injury is not directly caused by the acts of the defendant but rather results from intervening forces or events, such as negligent medical treatment, escape attempts, or the negligent or intentional acts of a third party. Where such intervening events are foreseeable and naturally result from a perpetrator's criminal conduct, the law considers the chain of legal causation unbroken and holds the perpetrator criminally responsible for the resulting harm.

*Id.*

In this case, Plaintiffs have plausibly pled that it was reasonably foreseeable that Defendants' violations of California Penal Code § 30605 would lead to the kind of harm Plaintiffs suffered. Specifically, Plaintiffs pled, among other things, that:

> (1)    "[P]rior to 2019, [Defendants] received copious actual or constructive notice from information including, but not limited to, trace requests, that their negligent and unlawful distribution practices

39

regarding WASR-10 assault rifles and other firearms
were fueling gun violence in California and other
jurisdictions with strong gun violence prevention
regime."  ECF No. 1 at 17, ¶ 80.

(2)  "[A] 2011 report from the Center on Public
Integrity described how the WASR-10 has been the most
common gun purchased in the United States to later be
connected to crimes occurring in Mexico."  *Id.* ¶ 81.

(3)  "In a four-year time frame in the mid-2000s, over
5000 WASR-10 rifles initially purchased in the United
States were later recovered from Mexican crime scenes
and/or during criminal investigations," accounting
"for over 17% of all such guns recovered during this
time frame."  *Id.* ¶¶ 83-84.

(4)  "The ATF and/or other law enforcement agencies
contacted various Defendants (including Century Arms)
as part of its trace requests to track each one of
these recovered firearms through the chain of
distribution down to the initial seller."  *Id.* at 18,
¶ 87.

(5)  "2017 data from the ATF confirmed that Nevada is
a major source state for crime guns later recovered in
California – linking 1,554 California crime guns to
sales in Nevada."  *Id.* ¶ 91

(6)  "In 2017, researchers at the University of
California at Berkeley found that within 14 days after
the start of a Nevada gun show, hospital admissions
for gunshot wounds at California hospitals within two
hours of the Nevada border jumped by 70%."  *Id.* at 19,
¶ 94.

On these facts, a reasonable jury could find that it was

reasonably foreseeable that aiding and abetting unlawful

possession of WASR-10s in California would lead to the unlawful

use of those guns in violent crimes.  *See, e.g.*, *Estados Unidos*

*Mexicanos*, 91 F.4th at 534 (finding that, by aiding and abetting

unlawful trafficking of guns into Mexico, the defendant

proximately caused "the Mexican government to incur significant costs in response to the increased threats and violence accompanying drug cartels armed with an arsenal of military-grade weapons").

The Court therefore finds that Plaintiffs have plausibly pled Defendants violated California Penal Code § 30605 and that this violation was a proximate cause of Plaintiffs' harm. While Plaintiffs allege other statutory violations as well, the Court need not address those at this time as a single violation is sufficient for the PLCAA's predicate exception to apply. The PLCAA does not preempt Plaintiffs' causes of action.

## VI.  Common Law Claims

### A.  Product Liability

The Complaint's first cause of action asserts a product liability claim. With respect to allegations of a design defect, California law allows for a risk-benefit theory. *Soule v. Gen. Motors Corp*., 8 Cal. 4th 548, 567 (1994). California product liability law also allows for both strict liability and negligence theories. *Merrill v. Navegar, Inc*., 26 Cal. 4th 465, 478 (2001). Here, Plaintiffs appear to be proceeding under a negligence theory, arguing that "Defendants violated their duty not to manufacture[], distribute, market, and/or sell defective products by selling unreasonably dangerous and/or illegal WASR-

10 weapons like the Rifle to the public." ECF No. 1 at 25, ¶ 124.

Under California law, the evidence required to prove strict liability-based and negligence-based design defect claims is largely the same. *Merrill*, 26 Cal. 4th at 480. Applying a strict liability theory, a product is defective in design "if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design." *Barker v. Lull Eng'g Co.*, 20 Cal. 3d 413, 432 (1978). To establish a *prima facie* case of design defect, a plaintiff must show: (1) that the defendant manufactured, distributed, or sold the product, (2) that the plaintiff was harmed, and (3) that the product's design was a proximate cause of the plaintiff's harm. *See* Cal. Civ. Jury. Inst. § 1204. If the plaintiff makes this showing, the burden shifts to the defendant to present evidence that the benefits of the product's design outweigh the risks. *Barker*, 20 Cal. 3d at 432. In weighing benefits and risks, the decisionmaker "may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer design, the financial cost of an improved design, and the adverse consequences to the

42

product and to the consumer that would result from an alternative design." *Merrill*, 26 Cal. 4th at 479 (quoting *Barker*, 20 Cal. 3d at 431).

A negligence theory "involves a balancing of the likelihood of harm to be expected from a machine with a given design and the gravity of harm if it happens against the burden of the precaution which would be effective to avoid the harm." *Id.* (quoting *Pike v. Frank G. Hough Co.*, 2 Cal. 3d 465, 470 (1970)). Put differently, a manufacturer acts negligently if "a reasonable person would conclude that the magnitude of the reasonably foreseeable harm as designed outweighed the utility of the product as so designed." *Id.* (quoting Prosser & Keeton, Torts (5th ed. 1984) § 96, p. 688). Thus, as noted above, "most of the evidentiary matters relevant to applying the risk/benefit test in strict liability cases are similar to the issues typically presented in a negligent design case." *Id.* (internal quotation marks omitted) (quoting *Barker*, 20 Cal. 3d at 431).

Because Plaintiffs appear to be proceeding under a negligence theory, they need to plausibly plead four elements: (1) that Defendants manufactured the WASR-10, (2) that Plaintiffs were harmed, (3) that the WASR-10's design was a proximate cause of their harm, and (4) that Defendants acted negligently. *Merrill*, 26 Cal. 4th at 479; *Barker*, 20 Cal. 3d at 573. Pleading negligence is functionally equivalent to pleading

that the WASR-10 was defective, as it requires showing that "a reasonable person would conclude that the magnitude of the reasonably foreseeable harm as designed outweighed the utility of the product as so designed." *Merrill*, 26 Cal. 4th at 479 (quoting Prosser & Keeton, Torts (5th ed.1984) § 96, p. 688).

Plaintiffs have clearly pled that Defendants manufactured/distributed the product and that Plaintiffs were harmed. Their theory of causation is essentially that the WASR-10 had features that made it uniquely lethal, which thus contributed to the extent of the injuries suffered in the attack. They also argue that the high lethality of these design features made it reasonably foreseeable that a mass shooter would choose a WASR-10 to commit an attack, and that such design features would make the attack more deadly.

Plaintiffs point to three design features that allegedly made the rifle particularly lethal and susceptible to use in a mass shooting: (1) it was designed "to accept a large capacity detachable magazine," (2) it had "a conspicuous pistol grip," and (3) it "had a folding stock." ECF No. 1 at 10, 24, ¶¶ 49, 122. Plaintiffs allege that such features "make firearms like the Rifle more effective in military combat or mass shooting scenarios like the Attack while serving no or little benefit to civilian users of such firearms employing them for lawful ends like hunting." *Id.* at 9, ¶ 40.

44

Defendants were allegedly on notice that assault-style rifles like the rifle used in the attack were in high demand by people in California, where the sale of assault-style rifles is prohibited. *Id.* at 19, ¶ 98. Defendants also allegedly had actual or constructive knowledge that "semi-automatic assault rifles like the Rifle are the preferred firearm of mass shooters because of their ability to inflict so much damage on multiple targets in a short time frame," pointing to multiple other mass shootings in which similar weapons were used. *Id.* at 20, ¶¶ 100-01.

Plaintiffs argue that these allegations demonstrate "the unique susceptibility of firearms like the Rifle to misuse in mass shootings." *Id.* at 21, ¶ 102. They state that "Defendants did not take any action to reduce the risk of their firearms being misused in a tragedy like the Attack" and that, "[i]f anything, [they] may have chosen to exacerbate the risk by recklessly marketing firearms in ways which emphasized their effectiveness in military-style assaults like the attack*." Id.* ¶¶ 103-04. All of this, Plaintiffs argue, made the Gilroy Garlic Festival shooting "a foreseeable consequence of Defendants' decision to manufacture[], distribute, market, and/or sell defective products with features making them particularly effective tools for such assaults." *Id.* at 25, ¶ 125. Moreover, Plaintiffs allege that, but for Defendants'

45

design decisions, "the Shooter would not have had access to the
Rifle and could not have used to harm the plaintiffs." *Id.* ¶
124.

Accepting these allegations as true, the Court finds it
plausible that the cited design made the WASR-10 a more
effective and lethal tool for a mass shooting, and that this
increased lethality contributed to Plaintiffs' harm.  It is also
plausible that these design features would impel a mass shooter
to choose a WASR-10 over a less lethal device, and that such
design features would make a mass shooting like the one here
more deadly.

Defendants argue that Plaintiffs have failed to either
identify a design defect or claim that the rifle failed to
operate as designed.  Nonetheless, applying the risk-benefit
analysis, Plaintiffs have pointed to specific design components
that they allege "serv[e] no or little benefit to civilian users
of such firearms employing them for lawful ends like hunting*."
Id.* ¶ 40.  While additional factual development may enhance this
analysis for one or both sides, at this stage in the case the
Court finds that, applying California law, Plaintiffs have pled
a plausible product liability claim.

    B.   **Negligence**

Defendants argue that Plaintiffs' negligence claim
necessarily fails because, "[i]n order to impose a duty to

control the acts of another, there must be a recognized 'special relationship.'"  ECF No. 14 at 23 (quoting *Regents of Univ. of Cal. v. Superior Court*, 413 P.3d 656, 664 (Cal. 2018)). Plaintiffs counter that no "special relationship" was required because their claim is based on Defendants' affirmative misconduct in breaching its duty of reasonable care, rather than a duty to control third parties.  The Court must therefore determine whether Plaintiffs' claim is based on Defendant's general duty of care to Plaintiffs, or a duty to control the shooter.

"To establish liability in negligence, it is a fundamental principle of tort law that there must be a legal duty owed to the person injured and a breach of that duty which is the proximate cause of the resulting injury."  *Ileto*, 349 F.3d at 1206 (quoting *Jacoves v. United Merchandising Corp.*, 11 Cal. Rptr. 2d 468, 484 (Cal. Ct. App. 1992)).  "As a general principle, a defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous."  *Tarasoff v. Regents of Univ. of California*, 17 Cal. 3d 425, 434-35 (1976) (internal quotations omitted).  There is no general duty to control the conduct of another except when "the defendant stands in some special relationship to either the person whose conducts

need to be controlled or in relationship to the foreseeable victim of that conduct." *Id.* at 435.

Plaintiffs argue that Defendants owed them a general duty of care because it was reasonably foreseeable that their negligent conduct would lead to a mass shooting. In *Ileto*, the Ninth Circuit considered whether, under California law, a gun manufacturer owed a duty of care to the victims of the shooting absent a special relationship between the defendant and the third person tortfeasor, or between the defendants and the plaintiffs. The plaintiffs were victims and family members of victims of a mass shooting perpetrated in California. *Ileto*, 349 F.3d at 1192. They filed suit against the manufacturers, distributors, and dealers of the guns used in the attack, alleging that the defendants engaged in deliberate and reckless marketing strategies and that they intentionally produced more firearms than the legitimate market demands with the intent of marketing their firearms to illegal purchasers. *Id.* at 1196. The plaintiffs further alleged that the defendants engaged in a number of distribution practices that made it easier for people to obtain guns illegally and that the assailant illegally purchased the guns he used in the attack through those distribution channels. *Id.* at 1196-98. Finally, the plaintiffs claimed that the defendants created and controlled the distribution channels that the assailant used to buy these guns

48

and that the defendants gained significant revenue from illegal
gun sales. *Id.* at 1198.

The Ninth Circuit held that, on these facts, the gun
manufacturer "was in a position to prevent the harms alleged"
and, therefore, owed the plaintiffs a duty of care. *Id.* at
1207. The court specifically pointed to the fact that the
plaintiffs alleged "that [defendant] Glock knew which
distributors sold guns that were later found to be purchased by
prohibited buyers and used in crimes," and that "Glock's
marketing and distribution system essentially targeted the gun
show and unlicensed sales market where background checks are not
required so that illegal purchasers could buy their guns." *Id.*
Further, "Glock . . . was in a position to use the information
the ATF made available to it to modify its distribution
practices or to offer training to its distributors that would
help them identify straw purchasers and purchasers who would in
turn sell to illegal purchasers like Furrow." *Id.* In reaching
this conclusion, the Ninth Circuit quoted an analogous case,
*Cincinnati v. Beretta U.S.A. Corp.*, which posed the question
this way: "the issue is whether appellees are themselves
negligent by manufacturing, marketing, and distributing firearms
in a way that creates an illegal firearms market that results in
foreseeable injury." *Glock*, 349 F.3d at 1207 (quoting

*Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1144 (Ohio 2002)).

Here, Plaintiffs have sufficiently pled that Defendants owed them a duty of care. As in *Ileto*, Plaintiffs have alleged that Defendants intentionally produced and sold more guns than the legal market in Nevada could bear, ECF No. 1 at 13, ¶ 58; that they have received numerous ATF trace requests putting them on notice as to which of their distributors were engaging in sales to criminals, *id.* at 17, 18, ¶¶ 79, 89; that they engaged in marketing practices that intentionally targeted illegal buyers, *id.* at 13, 21, ¶¶ 61, 104; that they knowingly facilitated the illegal gun market to increase their profits, *id.* at 4, 20, ¶¶ 15, 100; that Defendants knew that their guns were being trafficked into and used in crimes in California and Mexico in high numbers, *id.* at 13, 18, 19, ¶¶ 60, 87, 89, 98; and that there were measures that Defendants could take to mitigate the risk of illegal sales and gun violence, *id.* at 13, 17, ¶¶ 61, 79. Accepting these factual allegations as true, it was foreseeable that California residents like Plaintiffs would be endangered by Defendants' conduct. Defendants therefore owed Plaintiffs a general duty of care, and Plaintiffs have asserted a plausible cause of action for negligence.

**C.    Public Nuisance**

Under California law, "[a]nything which is injurious to
health, including but not limited to, the illegal sale of
controlled substances, or is indecent or offensive to the
senses, or an obstruction to the free use of property, so as to
interfere with the comfortable enjoyment of life or property ...
is a nuisance." Cal. Civ. Code § 3479. A public nuisance "is
one which affects at the same time an entire community or
neighborhood, or any considerable number of persons, although
the extent of the annoyance or damage inflicted upon individuals
may be unequal." Cal. Civ. Code § 3480. To be actionable, the
interference with a public right or collective social interest
must be "substantial and unreasonable." *People v. ConAgra
Grocery Products Co.*, 227 Cal. Rptr. 3d 499, 552 (Cal. Ct. App.
2017). An interference "is substantial if it causes significant
harm and unreasonable if its social utility is outweighed by the
gravity of the harm inflicted." *Id.*

A defendant can be statutorily immune from public nuisance
liability when "an alleged nuisance inexorably and inescapably
flows from [a] statutorily authorized act." *City of Norwalk v.
City of Cerritos*, 317 Cal. Rptr. 3d 880, 889 (Cal. Ct. App.
2024). However, when "the alleged tortfeasor has some leeway in
how to undertake the authorized act . . . [statutory] immunity
does not apply." *Id.* And, contrary to Defendants' assertion,
the lawful activities for which a defendant may be held liable

51

for public nuisance include manufacturing and selling lawful products. *See, e.g., People v. ConAgra Grocery Products Co.*, 227 Cal. Rptr. 3d 499, 553-54 (Cal. Ct. App. 2017) (finding defendants that produced and sold lead-based paint were liable for public nuisance even though they had not violated any regulation or law).

Defendants contend that the manufacture and sale of a legal product cannot constitute a public nuisance. California law, however, offers no such blanket exception to public nuisance liability. *See, e.g., id.* Nor is it dispositive that Defendants lacked control over their products at the time of injury.

The most relevant case, again, is *Ileto*. There, the plaintiffs brought a public nuisance claim alleging that a gun manufacturer, Glock, had marketed, distributed, promoted, and sold firearms "with reckless disregard for human life and for the peace, tranquility, and economic well being of the public." *Id.* at 1210. Specifically, the plaintiffs alleged that Glock had "created a firearms market that [was] oversaturated and their conduct [has] unreasonably interfered with public safety and health." *Id.* The plaintiffs argued that Glock's actions caused their specific and particularized injuries and that Glock had actual knowledge of the injurious impact of their actions on

the health, safety, and welfare of the California public.  *Id.*
at 1210-11.

In defending against this claim, Glock argued that "the
plaintiffs failed to allege that Glock had control over the gun
when the plaintiffs were injured and that such control is a
necessary element of a nuisance claim."  *Id.* at 1212.  The Ninth
Circuit concluded that no such control was required.  *Id.*  The
court reasoned that, although plaintiffs would need to establish
proximate cause, "California's law of proximate or legal cause
does not contain a control requirement."  *Id.*  Rather, under
California law, the defendants act or omission need only be a
"substantial factor to the harm suffered" to constitute
proximate cause.

Glock also argued that the plaintiffs' public nuisance
claim should be dismissed because the action targeted the legal
manufacture and sale of guns.  The Ninth Circuit rejected this
argument as well, explicitly stating that "the fact that the
manufacture and sale of guns is legal does not prevent the
plaintiffs from pursuing their nuisance claim."  *Id.* at 1214.
Instead, a public nuisance action could be maintained for
injuries caused by a product so long as "the facts establish
that the design, manufacturing, marketing, or sale of the
product unreasonably interferes with a right common to the
general public."  *Id.* (quoting *Beretta U.S.A. Corp.*, 768 N.E.2d

53

at 1142).  Moreover, the court reasoned that although Glock may have engaged only in legal sales, the plaintiffs' nuisance claim "rests on the defendants' actions in creating an illegal secondary market for guns by purposefully over-saturating the legal market."  *Id.*

*Ileto* explained that California courts have long recognized that "the fact that a certain occupation or business can be performed in a legal manner does not prevent that occupation or business from becoming a nuisance when the occupation or business is performed in a manner that unreasonably infringes on a public right."  *Id.*  That is, immunity applies only when "an alleged nuisance inexorably and inescapably flows from [a] statutorily authorized act," not when "the alleged tortfeasor has some leeway in how to undertake the authorized act" and chooses to do so in a way that interferes with a public right. *City of Norwalk*, 317 Cal. Rptr. 3d at 889.

Here, as in *Ileto*, Plaintiffs have sufficiently alleged that Defendants knew or should have known that their marketing and distribution practices would likely result in injuries of the types suffered by Plaintiffs.  Thus, the fact that Defendants technically engaged only in "legal" sales is not a bar to Plaintiffs' action.

**D.    Proximate Cause**

Defendants separately challenge each of Plaintiffs' causes of action by arguing that "the intentional criminal acts of a third party will constitute the proximate cause of an injury, superseding any prior negligence." ECF No. 14 at 25. Plaintiffs counter that "intervening actions by a third party – even if intentional and criminal – do not constitute superseding causes where, as here, those intervening actions were foreseeable results of the initial actor's misconduct." ECF No. 21 at 14.

"[U]nder California law, where an intervening act by a third party was foreseeable, it does not amount to a superseding cause relieving the negligent defendant of liability." *Ileto*, 349 F.3d at 1208. "[F]oreseeability may arise directly from the risk created by the original act of negligence: 'If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, [o]r criminal does not prevent the actor from being liable for the harm caused thereby.'" *Landeros v. Flood*, 17 Cal. 3d 399, 411 (1976) (quoting *Vesely v. Sager*, 5 Cal. 3d 153, 164 (1971)).

Plaintiffs have sufficiently alleged that Defendants' conduct was a proximate cause of their injuries. Contrary to Defendants' argument, an intentional criminal act is not, as a matter of law, the sole proximate cause of an injury. Rather,

the factfinder must determine whether that intentional criminal act was a foreseeable result of Defendants' conduct.  Here, Plaintiffs have specifically alleged that the shooter's actions were a foreseeable result of Defendants' conduct, and they have alleged myriad factual allegations to support that conclusion. Indeed, this is a case in which "one of the hazards which makes [Defendants'] negligent" was that "a third person [might] act in a particular manner." *Landeros*, 17 Cal. 3d at 411.  Defendants' argument on this issue is therefore without merit.

### Conclusion

For the reasons set forth above, Century Arms' motion to dismiss (ECF No. 14) is denied.

DATED at Burlington, in the District of Vermont, this 3rd day of December 2024.

<u>/s/ William K. Sessions III</u>
Hon. William K. Sessions III
U.S. District Court Judge