THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT
CIVIL DIVISION

| | |
|---|---|
| WENDY TOWNER; et al., <br><br> Plaintiff, <br><br> v. <br><br> CENTURY ARMS, INC., and ROMARM, S.A., <br><br> Defendants. | C.A. No. 2:22-cv-145 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CENTURY ARMS, INC.'S MOTION FOR RECONSIDERATION OR, IN THE ALTERNATIVE, FOR LEAVE TO APPEAL THE INTERLOCUTORY ORDER AND/OR MOTION TO STAY**

Defendant Century Arms, Inc. ("Century") respectfully submits the following Motion for Reconsideration of the Order dated December 3, 2024, which denied Century's Motion to Dismiss. In the alternative, Defendant respectfully requests leave to appeal the interlocutory order pursuant to 28 U.S.C. § 1292(b) and/or for a stay pending the United States Supreme Court's decision in Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.

**ARGUMENT**

**I.    DEFENDANT RESPECTFULLY CONTENDS THAT THE MOTION TO DISMISS SHOULD HAVE BEEN GRANTED.**

**A.  Standard.**

A motion for reconsideration is permissible is governed by Local Rule 7(c). Kew v. Town of Northfield, Vermont, 681 F. Supp. 3d 247, 250 (D. Vt. 2023); Pietrangelo v. Alvas Corp, 664 F. Supp. 2d 420, 431 (D. Vt. 2009). Reconsideration is appropriate when the movant identifies "an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Kolel Beth Techiel Mechil of Tartikov, Inc. v. YLL

1

Irrevocable Trust, 726 F.3d 99, 104 (2d Cir. 2013); Jones v. Vermont State Police, 2023 WL 3682201, at *1 (D. Vt. May 8, 2023), appeal dismissed, 2023 WL 11054473 (2d Cir. Dec. 27, 2023). Reconsideration is warranted when there are controlling decisions or information that the court overlooked. Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012).

### B. Argument.

#### 1. The Court's Order Did Not Consider U.S. Supreme Court Precedent.

In Twitter, Inc. v. Taamneh, 98 U.S. 471 (2023), a collection of plaintiffs brought suit against certain social media platforms for "aiding and abetting" ISIS based on the claim that these companies "knew that ISIS was using their platforms but failed to stop it from doing so." Id. at 473. The U.S. Supreme Court rejected this claim, holding that the plaintiffs failed to state a claim. Id. A company cannot be held liable under an "aiding and abetting" claim just because it knows that some bad downstream actors are misusing its products. Id. Instead, such a claim requires "that the defendant consciously and culpably participated in a wrong act so as to help make it succeed." Id. at 479. "**In other words, the defendant has to take some 'affirmative act' 'with the intent of facilitation the offense's commission.'**" Id. (emphasis added and internal quotations omitted).

Here, no such showing is made. Specifically, Plaintiff has not even alleged that the sale to the shooter (a Nevada resident in Nevada) was unlawful, and Century is far removed from that sale anyway (as the firearm was shipped to a distributor in another state and then sold to a dealer in Nevada). More pointedly, the only illegal activities were the acts of the Shooter. Under these circumstances, Defendant Century cannot be held liable for "aiding and abetting" simply because the Shooter criminally transported and criminally used a lawfully manufactured, lawfully distributed, and lawfully sold product.

### 2. Nevada Law Should Apply to Bar This Lawsuit.

As the Court acknowledged, application of Nevada law would require dismissal of this lawsuit and that:

> Nevada's primary contact is that it was the place where the rifle was sold. As Century Arms argues, Nevada has an interest in avoiding an impediment to lawful gun sales in the state. **Applying Nevada law would thus arguably support the needs of the interstate system by ensuring that injuries occurring outside of Nevada cannot affect commerce or lawful gun ownership within Nevada.**

(Dkt. No. 30 at p. 16 (emphasis added).) Despite acknowledging the facts that (1) Nevada Legislature allows the rifle at issue to be sold within its State; (2) the rifle was lawfully sold to a Nevada resident in Nevada; and (3) Nevada has a clear interest in avoiding an impediment to lawful firearm sales in Nevada; and (4) injuries occurring outside of Nevada *"cannot"* affect commerce or lawful gun ownership in Nevada, the Court concluded that California law applies to all the claims because "Nevada has no legitimate interest in facilitating gun sales to California-based criminals who cannot lawfully own WARS-10s." (Id. (emphasis added).)

This contention is not supportable in the context of the facts pleaded in this case. Specifically, **there is no allegation of an unlawful sale in Nevada nor is there a contention that the Shooter "cannot lawfully own" the firearm in question.** Rather, the pleadings establish that the *only* illegal conduct was the Shooter transporting a firearm into California and then the Shooter criminally using it at the festival. Under the actual facts pleaded in the Complaint, Nevada has the greater interest in seeing that its laws applicable to the sale of firearms in its state are applied so its policy choices about gun ownership and commerce are not impacted. Any other result will create a situation where firearm manufacturers and firearm sellers will have to comply with California's laws (namely, only sell firearms allowed under California law) or risk being haled into Court for lawfully selling firearms in another state. For obvious reasons, this cannot be the case. Thus, Nevada law should apply, and Plaintiffs' claims are barred by Nevada Revised Statute

Section 41.131 because "[n]o person has a cause of action against the manufacturer or distributor of *any firearm* or ammunition." Parsons v. Colts Mfg. Co., LLC, 499 P.3d 602, 607 (Nev. 2021) (quoting NRS 41.131(1)).

### 3. Plaintiff's First Cause of Action Does Not Meet the Product Liability Exception to the PLCAA.

Although focusing primarily on the predicate exception in its Order, the PLCAA also defines when a plaintiff can pursue a product liability claim against a firearm manufacturer. The product liability exception states that the PLCAA will not bar

> an action for death, physical injuries or property damage resulting directly from a defect in design or manufacture of the product, when used as intended or in a reasonably foreseeable manner, **except that where the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage** . . . [.]

15 U.S.C. § 7903(5)(A)(v) (emphasis added). Thus, a plaintiff is permitted to bring a product liability claim under the PLCAA *unless* the discharge of the product was caused by the volitional act that constituted a criminal offense. When that occurs, this will be the sole proximate cause of any resulting death or personal injuries, and a plaintiff cannot maintain a product liability claim.

Here, the Court did not address this section of the PLCAA and, instead, spent considerable time arguing that the features on the rifle (which are permitted under Nevada law but not under California law) constitute a plausible product liability claim under California law. Aside from this being a misstatement of the law,[1] the Order never addresses the fact that the product liability claim

---

[1] California courts require there to be an actual defect in the product. Soule v. Gen. Motors Corp., 882 P.2d 298 (Cal. 1994) (explaining that there must be an actual defect in the product). The risks from firearms "arise from the function of the product, not any defect in the product," which means there is no basis for a product liability claim. McCarthy v. Sturm, Ruger & Co., Inc., 916 F. Supp. 366, 371 (S.D.N.Y. 1996), aff'd sub nom., McCarthy v. Olin Corp., 119 F.3d 148 (2d Cir. 1997). Moreover, Plaintiffs' no-defect product liability claim is reminiscent of "Turley lawsuits" from the 1980s, which were lawsuits alleging that lawfully sold and purchased handguns served no purpose and were intended to force firearms companies to spend significant funds defending the cases. These cases were roundly rejected. See, e.g., Baniewicz, Jill, Is Hamilton v. AccuTek a Good Predictor of What the Future Holds for Gun Manufacturers?, Indiana Law Review, Vol. 34, no. 2 at pp. 423-25 (2001) (explaining that courts have uniformly

4

is barred by the PLCAA.   15 U.S.C. § 7903(5)(A)(v).

Here, it is undisputed that the Shooter's volitional acts constituted a criminal offense and that his volitional acts caused the product to discharge projectiles.  Id.  Under the facts pleaded, the product liability claim is barred by the PLCAA.  Id.; see also Travieso v. Glock Inc., 526 F. Supp. 3d 533, 548 (D. Ariz. 2021) (precluding a common law claim product liability claim because "[h]aving construed the PLCAA's general preemption provision and the PLCAA's product liability exception, the Court finds the PLCAA does bar Plaintiff's claims against Defendant where, as here, the shooting is caused by criminal possession and recklessness of a third party."); see also Ryan v. Hughes-Ortiz, 959 N.E.2d 1000, 1008-1009 (Mass. Ct. App. 2012) (same).  Indeed, California courts have also recognized this conclusion.  Chavez v. Glock, Inc., 207 Cal. App. 4th 1283, 1317-18 (2012) (explaining that the product liability exception to the PLCAA does not apply if the firearm's discharge was the result of a volitional criminal act).  Therefore, the Court erred in not dismissing Count I.

### 4. Under California Precedent, Plaintiffs' Claims for Negligence and Public Nuisance Must Be Dismissed.

As the Ninth Circuit explained in Ileto v. Glock Inc., 565 F.3d 1126 (9th Cir. 2009), a California common law negligence and public nuisance claim against a firearm manufacturer must be dismissed pursuant to the PLCAA.  Id. at 1129 (dismissing California common law negligence and public nuisance claims under the PLCAA).[2]  *Notably, the Court's Order never cited this case*.  Rather, the Court only cited to the Nonth Circuit's earlier decision, Ileto v. Glock, Inc., 349 F.3d 1191 (9th Cir. 2003), *which was decided prior to the enactment of the PLCAA*.  After the enactment

---

rejected strict liability, ultrahazardous, and risk-benefit analysis as bases to hold firearms manufacturers and sellers civilly liable for non-defective products).

[2] Despite finding that California law applied and that this case addressed California public nuisance and negligence claims under the PLCAA, the Court's Order never cited this case.  Rather, the Court only cited to the earlier decision, Ileto v. Glock, Inc., 349 F.3d 1191 (9th Cir. 2003), which was decided prior to the enactment of the PLCAA.

of the PLCAA, the Ninth Circuit reconsidered the claims in the context of the predicate exception and held that the PLCAA precludes common law tort claims, including negligence and public nuisance, because they are not recognized as an exception to the PLCAA. Ileto v. Glock Inc., 565 F.3d 1129. Recently, in Goldstein v. Earnest, which arose out of the shooting at the Chabad of Poway synagogue, the San Diego County Superior Court relied on the PLCAA to dismiss the plaintiffs' common law claims for negligence and public nuisance, as common law claims are barred by the PLCAA and such claims did not meet any exception. (Ex. A, Copy of Order from Goldstein v. Earnest.) The Court's failure to assess the Ileto case, or even cite the case, is clearly an error as Ileto makes certain that such causes of action (negligence and public nuisance) of action are not tenable under the PLCAA. Therefore, Plaintiffs' third and fourth counts should have also been dismissed pursuant to the PLCAA.

**5. The Predicate Exception Does Not Apply Because (1) There is No Knowing Violation of a Firearm Statute and (2) No Alleged Violation Was a Proximate Cause of the Harm at Issue.**

Tellingly, there is no allegation of any unlawful sale by anyone involved in the chain of distribution of this firearm. Instead, Plaintiffs posit that Defendant – a manufacturer of firearms – can be liable for "aiding and abetting" the Shooter's multiple criminal acts. In its Order, the Court found that this contention was sufficient to state a plausible claim for "aiding and abetting" to meet the predicate exception. However, when a manufacturer of a lawful product simply puts its product into the general stream of commerce, there is no authority supporting the conclusion that the manufacturer is required to police every bad actor who may ultimately obtain its product downstream. Indeed, no legal authority has been submitted to support such a sweeping proposition, and this is the exact purpose of the PLCAA – to prevent lawsuits against lawful firearm manufacturers when their products are criminally or unlawfully misused by intentional actors.

As noted by its express language, including the examples provided within the text of the Act itself, a firearm seller may be liable for aiding and abetting when it knows that the actual buyer of the firearm is barred from having it. 15 U.S.C. § 7903(5)(A)(iii)(II). Similarly, the PLCAA allows firearm transferors to be sued if they are convicted of violation certain statutes. Id. § 7903(5)(A)(i) (permitting claims when a seller provides a firearm knowing or having reasonable cause to believe that it will be used to commit a felony). These exceptions are to be construed narrowly, which would also support the purpose of the PLCAA. And the predicate exception only applies to situations where a firearm supplier knowingly makes an illegal sale to a specific criminal. To hold otherwise would entirely eviscerate the purpose of the statute and run counter to its stated intent.

The Court's reliance on the decision in New York v. Arm or Ally, LLC, is misplaced as that case involved "ghost guns," and New York had implemented a law that "banned the sale of unfinished frames and receivers" in the State. 2024 WL 756474 at *2 (S.D.N.Y. Feb. 23, 2024) (citing N.Y.C. Admin. Code § 10-314, N.Y. Penal Law §§ 265.63, 265.64). New York's laws not only criminalized possession of unfinished frames or receivers but also made it a crime to "sell" or "dispose" of such a frame or receiver in the State of New York. Id. Thus, the plaintiff alleged that the manufacturers of the unfinished frames and receivers violated the law by directly selling these into the State of New York. Id. Further, the court found that "ghost guns" were "firearms" under the law, which meant that the defendants also violated the law when selling these products without conducting a background check or serializing the frame. Id. at *5-6. Therefore, the Court found that the causes of action were based on the defendant's own violation of the law (by selling these products into New York), which meant that the causes of action did not "result[]from the criminal or unlawful misuse . . . by . . . a third party." Id. at *10-11. The Court also found that,

even if applicable, the defendant's intentional violation of the law by selling the products into New York met the "predicate exception" to the PLCAA. Id. at *11.

Contrarily, in this case, there are no similar allegations, and the rifle at issue was not sold into California and was lawful to purchase and own in Nevada. Here, the rifle was lawfully sold to a distributor in Texas (which is not a border state to California), lawfully sold to a retailer in Nevada, and lawfully purchased by a Nevada resident in Nevada. Again, as acknowledged, the only laws violated were those by the Shooter, and how could Defendant – a manufacturer – knowingly violate or knowingly "aid and abet" the Shooter's intentional violation of California's firearm laws? It simply cannot.

The Court's further reliance on Direct Sales Co. v. United States, 319 U.S. 703 (1943), and Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc., 91 F.4th 511 (1st Cir. 2024), is also misplaced. In Direct Sales, a *distributor directly sold* a grossly large amount of morphine to one rural doctor, who was criminally reselling the drugs. 319 U.S. at 705. The distributor was charged with conspiring to violate federal narcotics laws, which was affirmed by the U.S. Supreme Court. Id. at 714-15. The U.S. Supreme Court distinguished the situation – an atypical business practice by a morphine distributor that was directly selling **90 times** the amount of drugs to one doctor – from a situation involving routine business practices. Id. at 705-06, 713. In Direct Sales, there was also evidence that the distributor took affirmative steps to directly "coooperat[e]" with the doctor to avoid the law. Id. at 707, 713. There are no similar allegations in this case – Century did not directly supply to either the retailer or the purchaser of the firearm and it is undisputed that the firearm at issue was lawful for distribution to Nevada.

In Estados Unidos, (although Defendant respectfully contends that the District Court has

the better reasoned decision and that this decision will be reversed by the U.S. Supreme Court),[3] the First Circuit emphasized that there were allegations in that case of illegal sales at the retail level and that the manufacturers should have been monitoring for such bad actor dealers. The complaint further alleged that the manufacturers continued to sell firearms "to the very dealers that they know engage in straw sales and large-volume sales to traffic guns into Mexico."[4] 941 F.4th at 529. Again, in this case, there is no allegation that the sale in question was unlawful, that it was a "straw sale," or that any criminal act occurred other than the unilateral acts of the Shooter. Thus, the decisions in Direct Sales and Estados Unidos are not applicable.

### 6. This Lawsuit is Clearly Seeking to Regulate Commerce in Other States in Violation of the Constitution.

In the Order, the Court states that BMW of North America is distinguishable from the present case because "Plaintiffs seek an award aimed at protecting California residents, *i.e.*, residents of a state in which Defendants' alleged conduct *was* unlawful." (Dkt. No. 30 at p. 27.) This is confusing because the Court's holding basically states that if a plaintiff sustains an indirect injury in his home state despite the conduct in another state being lawful, bringing a lawsuit to impose the home state's laws on the out-of-state conduct does not violate the Constitution. *But this is precisely what the Fourteenth Amendment's Due Process Clause is designed to prevent.* The fact that Nevada borders California does not alter this conclusion.

In terms of the Dormant Commerce Clause, the Court's reliance on National Pork Producers Council v. Ross, 598 U.S. 356 (2023), is also incorrect. In that case, a California law prohibited *in-state sales* of pork meat that came from breeding pigs that were "confined in a cruel manner." Id. at 358. The plaintiffs (the National Pork Producers Council and the American Farm

---

[3] As noted below, this case is presently before the United States Supreme Court.
[4] Straw sales are where it is clear that a purchaser is buying a firearm for someone else, who likely cannot lawfully purchase one.

Bureau Federation) filed a lawsuit, arguing that the intended law violates the Constitution by "impermissibly burdening interstate commerce." Id. The Supreme Court explained that only Congress has the power to regulate commerce among the States, but, relying on prior precedent, noted that "a State may exclude from its territory or prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to the interests of its citizens." Id. (citing Guy v. Baltimore, 100 U.S. 434, 443 (1879)). The plaintiffs argued that there was an "almost per se" rule forbidding enforcement of state laws that would "have the practical effect of controlling commerce outside the State even when those laws do not purposely discriminate against out-of-state interests" because the law would impose substantial new costs on the out-of-state pork producers who wish to sell products into California. Id. This was rejected, with the Supreme Court explaining that there is no "per se" rule and that the Commerce Clause is not violated because a state law results in any impact on commerce outside the state. Id.

The Supreme Court was sure to explain, however, that the ruling is not meant to "trivialize the role territory and sovereign boundaries play in our federal system" and that a feature of the Constitution is that it allows "'different communities' to live 'with different local standards.'" Id. at 375-76 (quoting Sable Comms. of Cal., Inc. v. FCC, 492 U.S. 115, 126 (1989)). Indeed, one State should not be able to prosecute the citizen of another state for acts committed outside the first State's jurisdiction. Id. (internal quotations omitted).

The law at issue in Pork Producers regulated the type of pork meat that could be lawfully sold within the State of California, and the out-of-state impact on farmers was that it was going to be more expensive if they wanted to sell their products within California. In this case, Defendant is not arguing that California's laws regarding firearms violates the commerce clause; Defendant is arguing that this lawsuit – which is attempting to force California's firearms policies on entities

outside its border – violates the Commerce Clause. Thus, the decision in Pork Producers is not germane to the matter at hand.

### 7. 14 V.S.A § 1492(e) is Not Ambiguous.

Principles of statutory construction require statutes to be read in conjunction with the other words in the statutory section and should not be read standing alone. See, e.g., Bud Crossman Plumbing & Heating v. Comm. of Taxes, 142 Vt. 179, 185-86 (1982). Here, Defendant noted that the entirety of Section 1492 must be read together, which means that section (a) and section (e) must be read together so that the totality of the statute is given effect. In its Order, the Court concluded that these two sections were ambiguous when read together, and resorted to assessing the legislative history. However, Defendant contends that the two sections, do not create any ambiguity. Rather, reading both sections makes clear that the statute extends the time to bring a wrongful death claim against "a person who is charged with homicide" or when "the death of the decedent was caused by an intentional act constituting murder" and extends the time to two years "after judgment in that criminal action becomes final." 14 V.S.A. § 1492(a), (e). Reading these two sections together does not create an ambiguity, it merely provides three different situations where the statute is extended against a person charged with homicide, tried for a homicide, or who has committed murder. Thus, the Court should not have resorted to assessing the legislative history.

Further, even acknowledging the legislative history, the Court never looks to Section (a) of the statute, and only focuses on the change to section (e), noting that at one point the legislature considered including the language that "a death caused by an intentional act constituting murder *may be commenced against the alleged perpetrator within 15 years after the death of the decedent*." (Dkt. No. 30 at p. 11.) The Court contends that the decision to not include the italicized

11

language and instead state that "the action may be commenced within seven years after the discovery of the death of the decedent" indicates that the Legislature considered this issue and chose not to limit the statute. But, this is incorrect. The Statute already had this limitation in section (a), so there was no reason to include it twice. Indeed, neither Plaintiff nor the Court cited to any case law supporting the proposition that the longer 7 year statute of limitations applies in a case like this one.

II. **IN THE ALTERNATIVE, DEFENDANT RESPECTFULLY REQUESTS LEAVE FOR INTERLOCUTORY APPEAL.**

A. **Standard.**

Interlocutory appeals in the District of Vermont are governed by 28 U.S.C. § 1292(b), which provides that a party may seek appellate review of an interlocutory order if it determines that three conditions have been met: (1) the ruling on which the appeal is sought involves a controlling question of law; (2) there is substantial ground for a difference of opinion as to that controlling question of law; and (3) an immediate appeal will materially advance the litigation. See Patient A v. Vermont Agency of Hum. Servs., 2015 WL 8665349, at *1 (D. Vt. Dec. 11, 2015); see also Wool v. Pallito, No. 2:11-cv-169, 2012 WL 1952990, at *8 (D. Vt. May 30, 2012); European Cmty. v. RJR Nabisco, Inc., 783 F.3d 123, 128 (2d Cir. 2015).

"As for the first requirement of the issue involving a controlling question of law, 'the district court should consider whether: reversal of the district court's opinion could result in dismissal of the action; reversal of the district court's opinion . . . could significantly affect the conduct of the action, or; the certified issue has precedential value for a large number of cases.'" Patient A, 2015 WL 8665349, at *1 (quoting S.E.C. v. Credit Bancorp, Ltd., 103 F. Supp. 2d 223, 227 (S.D.N.Y. 2000)). "The second requirement can be satisfied where there is 'substantial doubt that the district court's order was correct, where there is conflicting authority on the issue, or where

12

the issue is particularly difficult and of first impression for the Second Circuit.'" Patient A, 2015 WL 8665349, at *1 (quoting Goldberg v. UBS AG, 690 F. Supp. 2d 92, 103 (E.D.N.Y. 2010)).

### B. Argument.

In this case, all the elements required for appellate review of an interlocutory order are satisfied.

*First*, the ruling on which the appeal is sought involves a controlling question of law. Specifically, this case involves (1) a choice of law analysis that, if Nevada law applies, Nevada Revised Statute 41.131 would create a bar to Plaintiffs' case; (2) a choice of law analysis that bars Plaintiffs' personal injury or wrongful death claims if certain laws are applied; and (3) if the PLCAA is applied, it provides threshold immunity from this suit. City of New York v. Beretta U.S.A. Corp., 524 F.3d 384, 398 (2d Cir. 2008).

In terms of the PLCAA, in this way, it is not just a defense to liability; it is a bar to the lawsuit. Id.; see also Jefferies v. District of Columbia, 916 F. Supp. 2d 42, 47 (D.D.C. 2013) (holding that the PLCAA reflects congressional intent to "weed out, expeditiously, claims the PLCAA bars"). For example, in Sambrano v. Savage Arms, Inc., 338 P.3d 103 (N.M. Ct. App. 2014), while the trial court denied the motion to dismiss for failure to state a claim and found that the PLCAA was not applicable, it certified the case for interlocutory appeal because the issues pertaining to the applicability of PLCAA satisfied the requirements. Id. at 104 (reversing upon finding that the PLCAA barred all claims against the rifle manufacturer). In this case, if any of the identified grounds for appeal are decided in Defedant's favor, it will be a controlling issue of law warranting dismissal of this case.

*Second*, given the legal issues involved in this matter, there are clearly grounds for differences of opinion. For example, in Estados Unidos Mexicanos v. Smith & Wesson Brands,

13

Inc., 91 F.4th 511 (1st Cir. 2024), a case upon which the Court relied in its Order, the District Court granted the motion to dismiss finding the PLCAA barred the claims but the First Circuit reversed on proximate cause grounds. Similarly, as acknowledged by the Court, there is a dearth of case law addressing the wrongful death statute that extends the deadline to file a complaint when there has been a criminal shooting. And, as the Court stated, the application of Vermont's longer statute of limitations (14 V.S.A. § 1492(e)) despite the fact that the Shooter is not named in this lawsuit is ambiguous when read in conjunction with other statutes.

*Third,* an immediate appeal will certainly materially advance this litigation. If the PLCAA applies, then his lawsuit must be immediately dismissed. See 15 U.S.C. §§ 7902(a), (b); 7903(5)(A). Similarly, if Nevada Revised Statute Section 41.131 – which the Court acknowledged applies to firearm sales in Nevada and that Nevada would have interest in applying its laws – applied, then Plaintiffs' claims should be dismissed. Thus, a resolution on these issues will materially advance this litigation and, given the circumstances at hand, is warranted.

**III.  IN THE ALTERNATIVE, THIS MATTER SHOULD BE STAYED PENDING THE SUPREME COURT'S DECISION IN *SMITH & WESSON BRANDS V. ESTADOS UNIDOS MEXICANOS*.**

**A. Standard.**

As the Supreme Court confirmed in Nken v. Holder, federal courts should consider the following four factors in deciding whether to stay a lower court's ruling pending the outcome of the appeal: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Nken v. Holder, 556 U.S. 418, 434 (2009) (citing Hilton v. Braunskill, 481 U.S. 770, 776 (1987)). Moreover, the Nken Court emphasized that "[t]he first two factors . . . are the most critical." Id. Courts in the Second Circuit accordingly apply the four

14

Nken factors when weighing whether to grant a motion to stay proceedings. The Second Court has held that these same four factors also apply in considering whether to vacate a stay. See In re World Trade Ctr. Disaster Site Litig., 503 F.3d 167, 170 (2d Cir. 2007).

**B.  Argument.**

The Court denied Defendant's motion to dismiss in its entirety, relying heavily on the First Circuit's 2024 decision in Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc., 91 F.4th 511 (1st Cir. 2024). (Dkt. No. 30 at p. 31-32, 36-40.) Specifically, the Court cited the case for the proposition that "[t]he predicate exception allows a plaintiff to bring common law claims that would otherwise be barred by the PLCAA "as long as there is a predicate statutory violation that proximately causes the harm." (Id. at p. 32 (citing Estados Unidos Mexicanos, 91 F.4th at 527). In that case, the government of Mexico brought claims against gun manufacturers alleging that they were aiding and abetting illegal trafficking of guns to Mexico because there was "significant demand for their guns among the Mexican drug cartels guns," and the manufacturers "can identify which of their dealers are responsible for the illegal sales that give the cartels" and "know the unlawful sales practices those dealers engage in to get the guns to the cartels." Id. at p. 36 (citing Estados Unidos Mexicanos, 91 F.4th at 529-30).[5] In its Order, the Court reasoned that the plaintiffs' allegations in this case are "analogous" to the ones in Estados Unidos Mexicanos. Id. Thus, the Court found the First Circuit's decision highly persuasive and relied upon it when denying Defendant's motion based on the application of the PLCAA.

However, the First Circuit's decision on these precise issues is now in question because the Supreme Court has agreed to review it. On April 18, 2024, the manufacturer defendants in Estados Unidos Mexicanos filed a petition for writ of certiorari to have the First Circuit's decision

---

[5] The First Circuit in Estados Unidos Mexicanos also relied on Direct Sales Co. v. United States, 319 U.S. 703 (1943), which this Court also cited. (See Dkt. No. 30 at p. 35-36.)

15

reviewed. (See https://www.supremecourt.gov/docket/docketfiles/html/public/23-1141.html.) On October 4, 2024, the United States Supreme Court granted certiorari placing the case on its October 2024 docket. (Ex. B, Order List of Cases.) And, the Opening Brief was filed with the Supreme Court on November 26, 2024. (Ex. C, Opening Brief.) The opposition brief is presently due on January 10, 2025 with the reply due thirty days later. Oral argument is set for March 4, 2025 at 10:00 a.m. The opening brief argues that (1) firearm manufacturers' lawful production of firearms is not a proximate cause of the injuries and (2) the predicate exception to the PLCAA cannot be met through an aiding and abetting theory against manufacturers. Accordingly, the District of Massachusetts also stayed its case pending a decision by the U.S. Supreme Court. (Ex. D, Order.)

Thus, the questions that will be decided by the Supreme Court are:

1. Whether the production and sale of firearms in the United States is the "proximate cause" of alleged injuries to the Mexican government stemming from violence committed by drug cartels in Mexico.
2. Whether the production and sale of firearms in the United States amounts to "aiding and abetting" illegal firearms trafficking because firearms companies allegedly know that some of their products are unlawfully trafficked.

If the answers to those questions are in favor of the defendants (firearm manufacturers), the decision would be dispositive to Plaintiffs' claims here. If the Supreme Court holds that the lawful production and sale of firearms is not the "proximate cause" of alleged injuries to the Mexican government stemming from violence committed by drug cartels in Mexico, this Court will be required to dismiss the claims in this case. Similarly, if the Supreme Court holds that the production and sale of firearms does not amount to "aiding and abetting" illegal firearms trafficking simply because firearms companies allegedly know that some of their products are unlawfully used, this Court will be required to dismiss Plaintiffs' claims. As will be briefly shown, all the relevant factors support granting a stay in this case.

*First*, given the issues in the case presenting before the U.S. Supreme Court, the first prong

16

is satisfied. Jenkins v. Miller, 2023 WL 1189729, at *2 (D. Vt. Oct. 11, 2023) (explaining that the "likelihood of success prong" requires a showing that the appellate court will take the appeal, not that there is a likelihood of success on the merits). Moreover, the decision by the Supreme Court will dictate the outcome of this case. In Estados Unidos Mexicanos, the District of Massachusetts *granted* the defendant manufacturers' motions to dismiss pursuant to the express terms of the PLCAA, but the First Circuit reversed on a narrow issue related to proximate cause. As articulated by Defendant in its opening brief, the First Circuit's decision ignored binding Supreme Court precedent and created an infinitely broad rule for proximate cause. This case presents an even weaker causal connection because there is no allegation that that sale by the retailer in Nevada was illegal or violated any law. As the Court acknowledged in its Order, the only criminal acts were those committed by the Shooter in unlawfully transporting the firearm into California and then criminally using it at the festival. Thus, a decision by the Supreme Court defining the scope of proximate cause with respect to the application of the PLCAA will determine the outcome of this case.

*Second*, there is no possibility of harm or damage to Plaintiffs from a six-month stay of the case. The Supreme Court's decision will be issued by June 26, 2025. (See https://www.supremecourt.gov/oral_arguments/calendarsandlists.aspx (explaining that all decisions from the current docket will be issued on or before the end of its term). Moreover, discovery has not even commenced in this case, and there will be a significant amount of discovery (both fact and expert) related to the facts and allegations in this case. There is not a colorable argument that Plaintiff will somehow be prejudiced by the grant of a stay in this case under the circumstances.

*Third*, all parties will be irreparably harmed absent a stay. Defendant (and Plaintiffs) will

be required to expend significant resources, including time and money, over the next six months to start fact discovery, conduct depositions, and engage in likely motion practice. All of these efforts may be for nothing given a likely favorable decision by the Supreme Court. Specifically, if the PLCAA applies, then this lawsuit must be immediately dismissed. See 15 U.S.C. §§ 7902(a), (b); 7903(5)(A). Indeed, Courts throughout the county have repeatedly explained that the PLCAA provides threshold immunity from a lawsuit and is not merely an affirmative defense. See, e.g., City of New York v. Beretta U.S.A. Corp., 524 F.3d 384, 398 (2d Cir. 2008) (holding that the PLCAA bars "the commencement or prosecution of qualified civil liability actions"). Thus, requiring Defendant to engage in discovery is a hardship that Congress intended to eliminate. See, e.g., In re Acad., Ltd., 625 S.W.3d 19, 32-36 (Tex. 2021) (directing judgment for defendant based on PLCAA immunity because permitting a trial "would defeat the substantive right" granted by the PLCAA").

*Fourth*, a stay will promote the orderly course of justice and serve the public interest. The interests of both the public and this Court also strongly justify a stay of the litigation. Allowing the U.S. Supreme Court to resolve a dispositive issue before this case proceeds any further promotes the public interest in the efficient, fair, and uniform administration of the judicial system.

Given the factors outlined above, as well as the fact that a stay of this case will only be – at most – six months, if the Court does not grant this motion for reconsideration and dismiss this lawsuit, Defendant respectfully submits that this matter should be stayed pending a decision by the U.S. Supreme Court in Estados Unidos Mexicanos.

## CONCLUSION

Based on the foregoing arguments and authorities, Defendant respectfully requests that its motion for reconsideration be granted and that Plaintiffs' lawsuit against Defendant Century Arms, Inc. be dismissed with prejudice. Alternatively, Defendant respectfully requests that the Court

grant leave to appeal this ruling and/or stay the case pending a decision by the United States Supreme Court in in <u>Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.</u>

Dated:  December 17, 2024

           By: s/*Andrew D. Manitsky*
             Andrew D. Manitsky, Esq.
             MANITSKY LAW, PLLC
             38 Pebble Beach Rd, Suite 1
             Colchester, VT 05446
             (802) 999-7150
             amanitsky@manitskylaw.com

             and

           By: *s/Danny C. Lallis*
             Anthony M. Pisciotti (Pro Hac Vice)
             Danny C. Lallis (Pro Hac Vice)
             Ryan L. Erdreich (Pro Hac Vice)
             PISCIOTTI LALLIS ERDREICH
             30A Vreeland Road Suite 300
             Florham Park, New Jersey 07932
             apisciotti@pisciotti.com
             dlallis@pisciotti.com
             rerdreich@pisciotti.com

             **Attorneys for Defendant Century Arms, Inc.**